In the Matter of THE COMPLAINT OF TAIRA LYNN MARINE LIMITED NO. 5, L.L.C. as Owner of the M/V Mr. Barry, Petitioning for Exoneration from or Limitation of Liability

Nos. CIV.A. 6:01CV1420, CIV.A. 6:01CV2484.

United States District Court, W.D. Louisiana. Lafayette–Opelousas Division.

July 6, 2004.

Grady J Abraham, Samuel D. Abraham, Koury Abraham & Lotief, Lafayette, LA, for Jays Seafood Inc, E J Mason, Jay Coletti, Kelly Ann Coletti, Anh Nguyen, Brian Landry, Chad Paul Migues, Craig Landry, Ding Dung Nguyen, Hung N Nguyen, Joseph Williams, Khoi Van Tran, Lawrence Duhon, Lum Thach, Mark Tolbert, Matthew Richard, Michael Luke, Raoul Romero, Suong Kim, Tai Tan Ngo, Thanh Tran, Thi Vo, Thoy C Pahn, Ti–Xuan Tran, Travis Simon, Ut Hoang Huynh, Vernie Miller, Yen Thi Nguyen, Third Party Plaintiffs.

### REASONS FOR JUDGMENT

HAIK, District Judge.

Pending before the court at this time are three motions for partial summary judgment filed by Kirby Inland Marine, L.P., the State of Louisiana through the Department of Transportation and Development, and Taira Lynn Marine, Inc. These motions for partial summary judgment (documents # 320, # 324, # 409, and # 329 respectively) seek the dismissal of the "purely economic loss" claimants in this matter pursuant to the jurisprudence of the Fifth Circuit as set out in the *Robins Dry Dock* and *Testbank* decisions. The motions also seek dismissal of the Oil Pollution Act of 1990 and Comprehensive Environmental Response Compensation Liability Act claims filed by the claimants in this matter.

### I. FACTS

In the early morning hours of July 19, 2001, the M/V MR. BARRY and its tow,

the T/B KIRBY 31801, allided with the Louisa swing bridge in St. Mary Parish, Louisiana. This allision happened at or close to mile 134 on the Intracoastal Waterway near Cypremore Point, Louisiana. T/B KIRBY 31801 ("the barge") was owned by Kirby Inland Marine, L.P. and the M/V MR. BARRY was owned and operated by Taira Lynn Marine, Inc. The cargo on the barge consisted of a gaseous cargo mixture of propylene/propane. This gaseous mixture was discharged into the atmosphere as a result of the allision. After the allision and subsequent gas discharge into the atmosphere, the Louisiana State Police Hazardous Materials Division ordered a mandatory evacuation of all businesses and residences within a certain radius of the Louisa swing bridge.

The geographical dimensions of this area of Louisiana are of extreme import to this court. Cypremore Point is basically an island in southwest Louisiana which is home to local residents and serves as secondary residences for many people in southwestern Louisiana. The Louisa swing bridge is the only means of ingress and egress from the Cypremore Point Island. It is the only connection that residents and businesspeople have with the mainland. This unfortunate allision of tug and tow with the Louisa swing bridge forced the residents and business owners from their respective residences and businesses, essentially decapitating the local business economy for only a couple of days.

As a result of this accident and subsequent evacuation, the following business owners and/or companies have filed claims in the limitation action seeking to recover damages for their alleged losses: Cajun Wireline, Inc.; North American Salt Company/Carey Salt Company; Coastline Marine, Inc; Pamela Dore d/b/a Cove Marina; Legnon Enterprises, Inc.; Marine Turbine Technologies, L.L.C.; Mason Seafood; CVD Incorporated d/b/a Rohm & Haas Advanced Materials; Morton International, Inc.; Riverfront Seawalls & Bulkheads; Bagala's Quality Oysters, Inc.; Big D's Seafood; Blue Gulf Seafood, Inc.; and Twin Brothers Marine. These claimants have made claims under the General Maritime Law, the Oil Pollution Act of 1990, the Comprehensive Environmental Response, Compensation, and Liability Act, and state law.

## II. RELEVANT PROCEDURAL HISTORY

Taira Lynn initiated the instant litigation under the Limitation of Liability Act, 46 U.S.C. Section 183, et seq., in which several hundred claims have been filed. These claims have been asserted against Taira Lynn Marine, Kirby Inland Marine, and the State of Louisiana through the Department of Transportation and Development, as the owner and operator of the Louisa bridge. The original limitation proceeding consolidated two declaratory judgment actions involving insurance coverage issues and other related matters. Magistrate Hill for the Western District of Louisiana held several conferences with counsel to determine the limits of discovery and the proper method of dealing with the "economic loss claimants." Thereafter, the instant motions for partial summary judgment were filed by Kirby Inland Marine (Doc. # 320), the State of Louisiana through the Department of Transportation and Development (Docs. # 324 and # 409), and Taira Lynn Marine (Doc. # 329).

## III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court of the United States eloquently reviewed this summary judgment standard. Justice Rehnquist stated that Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265.

## IV. APPLICABLE LAW

### A. The Economic Loss Issues

Due to longstanding precedent, this court must first consider the controlling cases of *Robins Dry Dock & Repair Co. v. Flint et al* and *State of Louisiana ex rel. Guste v. M/V TESTBANK,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), and 752 F.2d 1019 (5th Cir.1985)(en banc).

*Robins Dry Dock* involved "a libel by time charterers of the steamship Bjornefjord against the Dry Dock Company to recover for the loss of use of the steamer..." 48 S.Ct. at 134. This seminal case involved a "contract and damage" claim in which the libelants (respondents) "were not parties to that contract 'or in any respect beneficiaries' and were not entitled to sue for breach of it 'even under the most liberal rules that permit third parties to sue on a contract made for their benefit.'" *Id.* at 135. In coming to that determination, the *Robins* Court looked to the case of *German Alliance Insurance Co. v. Home Water Supply Co.,* which articulated the idea that "[B]efore a stranger can avail

himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least, show that it was intended for his direct benefit.'" 226 U.S. 220, 230, 33 S.Ct. 32, 35 (57 L.Ed. 195, 42 L.R.A. (N.S.)1000).

The issue in *Robins* as presented by the Supreme Court was "whether the respondents have an interest protected by the law against unintended injuries inflicted upon the vessel by third persons who know nothing of the charter." 48 S.Ct. at 135. In answering that question, the *Robins* Court held that "a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Id.*

The Fifth Circuit relied on the *Robins* decision when it handed down the decision of *State of Louisiana ex. rel. Guste v. M/V TESTBANK,* 752 F.2d 1019 (5th Cir.1985) (en banc) (relying on *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986)). On the date of the accident, the M/V SEA DANIEL, an inbound bulk carrier, and the M/V TESTBANK, an outbound container ship carrying hydrobromic acid, collided at approximately mile forty-one of the Mississippi River gulf outlet. As a result of the collision, some of the containers aboard the M/V TESTBANK went overboard into the Mississippi River. Shortly thereafter, a white haze of hydrobromic acid went into the atmosphere and approximately twelve tons of pentachlorophenol, PCP, went into the Mississippi River. The United States Coast Guard subsequently closed the outlet to navigation for approximately two weeks.

As a result, forty-one law suits were filed and consolidated in the Eastern District of Louisiana. These suits presented claims of shipping interests, marina and boat rental operators, wholesale and retail seafood enterprises not actually engaged in fishing, seafood restaurants, tackle and bait shops, and recreational fisherman. The defendants in *TESTBANK* moved for summary judgment as to all claims for economic loss unaccompanied by physical damage to property. The district court granted the requested summary judgment as to all of those claims "except those asserted by commercial oystermen, shrimpers, crabbers and fisherman who had been making a commercial use of the embargoed waters. The district court found these commercial fishing interests deserving of a special protection akin to that enjoyed by seamen." 752 F.2d at 1021, referring to *State of Louisiana ex rel. Guste v. M/V TESTBANK*, 524 F.Supp. 1170, 1173–74 (E.D.La.1981).

The *en banc* ruling in *TESTBANK* affirmed the original decision of the appeals panel and held that "claims for economic loss unaccompanied by physical damage to a proprietary interest were not recoverable in maritime tort." *Id.* In justification of its decision, the Court decided that "denying recovery for pure economic loss is a pragmatic limitation on the doctrine of foreseeability, a limitation we find to be both workable and useful." *Id.* at 1032. In reaching this conclusion, the *TESTBANK* Court stated that the rule of *Robins* "denied a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest." *Id.* at 1022. The Court also relied on an excerpt from Professor James' *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal:* "[T]he explanation ... is a pragmatic one: the physical consequences of negligence usu-ally have been limited, but the indirect economic repercussions of negligence may be far wider, indeed virtually open-ended." 25 Vand.L.Rev. 43, 45 (1972).

The Fifth Circuit opinion in the case of *Consolidated Aluminum Corporation v. C.F. Bean Corporation* also provides this court with guidance. 772 F.2d 1217 (5th Cir.1985). In that case, Bean ruptured a Texaco gas pipeline which provided natural gas to Consolidated's aluminum processing plant. This resulted in physical damages to Consolidated's equipment and supplies as well as attendant economic damages. The district court granted Bean's summary judgment on the economic loss issue. On appeal, the Fifth Circuit reversed and held that the "bright line rule of *Robins* and *TESTBANK* does not reach the instant case and that a plaintiff's claim of negligence for physical damages to equipment in which the plaintiff has a proprietary interest should be analyzed under tort principles applied by this Court in admiralty." *Id.* at 1218.

This court is also interested in the Fifth Circuit's analysis of the case of *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir.1974). In *Union Oil*, the defendant negligently caused an oil spill across the California coastline, resulting in the disruption of, among other things, commercial fishing operations. The Ninth Circuit upheld the idea that economic losses are not recoverable absent physical damage to a proprietary interest, but did carve out an exception for commercial fishermen. The court reasoned that "commercial fisherman were foreseeable plaintiffs whose interests the oil company had a duty to protect when conducting drilling operations." 752 F.2d at 1026. In reaching this conclusion, the Ninth Circuit used a foreseeability factor, evaluated the protected status of fishermen under the maritime law, and reasoned

that economic considerations also support recovery.

The Fifth Circuit concluded that this exception, carved out by the Ninth Circuit, was "carefully limited to commercial fisherman, plaintiffs economic losses were characterized as 'of a particular and special nature.'" *Id.*, citing *Union Oil v. Oppen,* 501 F.2d at 570. The *Union Oil* Court "expressly declined to 'open the door to claims that may be asserted by ... other[s] ... whose economic or personal affairs were discommoded by the oil spill' and noted that the general rule denying recovery for pure economic loss had 'a legitimate sphere within which to operate.'" *Id.* In furtherance of its' ruling, the *TESTBANK* Court concluded that the "holdings in *Kinsman* and *Union Oil* are not to the contrary. The courts in both those cases made plain that restrictions on the concept of foreseeability ought to be imposed where recovery is sought for pure economic losses." *TESTBANK* at 1027.

*In the Matter of the Libel and Petition of China Union Lines, Ltd.* is also intriguing to this court. 285 F.Supp. 426 (1967). It should be noted that this case has never been expressly overturned, and its well founded analysis provides some insight to this court. Two vessels collided in the Houston Ship Channel in November of 1961 resulting in the Channel being blocked for a period of two days. As a result of the collision, three vessels were delayed. The United States District Court for the Southern District of Texas found that the collision was caused by the negligence of the UNION RELIANCE. The District Court found that "this is simply a case involving the maritime tort of negligence, for which the vessel's owner is liable for all damages proximately resulting therefrom." 285 F.Supp. at 427. The Court went on to note that the UNION RELIANCE "owed a duty to all those using or seeking to use the ship channel not to obstruct their passage ... it was clearly foreseeable that a negligent collision ... would effectively delay all traffic ... the duty was breached and the foreseeable was made fact ... such damages ... are, in my opinion, recoverable." *Id.*

This court also takes particular note of the justifications of the Louisiana Supreme Court in the case of *PPG Industries, Inc. v. Bean Dredging, Inc.*, in which the Court utilized a case-by-case "duty-risk" approach. 447 So.2d 1058 (La.1984). The Louisiana Supreme Court's decision in *Bean Dredging* analyzed *Robins* "as based on a policy of avoiding multiplicity of actions and unforeseeable extensions of liability". *Id.* at 1060–61. In deciding *Bean,* the Louisiana Supreme Court employed a "duty-risk" analysis and evaluated the "moral, social and economic values involved" but concluded that those factors did not warrant extending a duty. *Id.*

Similarly, the Fifth Circuit employed various factors in reaching its conclusion in *TESTBANK.* This court will refer to these factors as the "managerial factor" and the "economic factor." In discussing the "managerial factor," it is important to note that the *TESTBANK* claimants urged the "requirement of physical injury to a proprietary interest is arbitrary, unfair, and illogical, as it denies recovery for foreseeable injury caused by negligent acts." 752 F.2d at 1028. The Fifth Circuit simply dismissed this contention by stating that those who oppose the current rule as arbitrary and unfair do not have an alternate workable theory. "Their approach fails to recognize limits upon the adjudicating ability of courts ... Courts can decide cases without preexisting normative guidance but the result becomes less judicial and more the product of a managerial, legislative or negotiated function." *Id.* The *TESTBANK* decision was partly due to

the fear of a "wave upon wave of successive economic consequences and the managerial role plaintiffs would have" the Court assume. *Id.* The Court seems to be resting its decision on a feeling of comfort, when it states that the bright line rule of damage to a proprietary interest, "as most, has the virtue of predictability with the vice of creating results in cases at its edge that are to be 'unjust' or 'unfair' . . . The present rule would be more candid, and in addition, by making results more predictable, serves a normative function. It operates as a rule of law and allows a court to adjudicate rather than manage." *Id.* at 1029.

The *TESTBANK* Court also analyzed certain "economic factor(s)." The passage from *TESTBANK* that sums up the Fifth Circuit's concern is: "With a disaster inflicting large and reverberating injuries through the economy, as here, we believe the more important economic inquiry is that of the relative cost of administration, and in maritime matters administration quickly involves insurance." *Id.* The Court again refers to Professor James' idea that "serious practical problems face insurers in handling insurance against potentially wide, open-ended liability." *Id.*, quoting 25 Vand.L.Rev. 43,53.

This court has searched for legislative authority suggesting that the court system protect a tortfeasor and its insurer over the legislative rights of the tortfeasor's victim. Finding none, before or after *TESTBANK,* one can only assume the courts have decided who to protect and who to abandon. It is up to Congress, not the courts, to limit liability. If this court make this determination, its role changes into one of a judicial activist—a role this court is not willing to assume. The *TEST-BANK* Court seemed to ignore this fundamental concept of separation of powers when It chose to protect marine insurers over the wrongfully aggrieved.

### B. The Oil Pollution Act of 1990

33 U.S.C.A. Section 2702 provides for the elements of liability for recovery under the Oil Pollution Act of 1990 (OPA 90). Section 2702(a) provides that "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident." This court takes important notice of the "Damages" section of the OPA 90, particularly sections 2702(b)(2)(A), (B), and (E). Section 2702(b)(2)(A) allows for "damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage. . ." Section 2702(b)(2)(B) provides for "damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property." Section (b)(2)(E) allows for the recovery of damages "equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. . ."

### C. The Comprehensive Environmental Response, Compensation, and Liability Act

CERCLA provides a remedy to a claimant seeking to recover response costs for removal and remediation of hazardous substances released into the environment. 42 U.S.C.A. Section 9201, et seq. Section 9201(23) defines the term "removal" as "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of release of hazardous substances into the environment . . . the term includes . . . temporary evacuation and

housing of threatened individuals not otherwise provided for..." 42 U.S.C.A. 9201(24) defines "remedy" to mean "those actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment ... the term includes ... such actions at the location of the release as storage, confinement ... neutralization, cleanup..."

## V. DISCUSSION

■ The major concern that drives this court's decision is fundamental fairness. One prominent factor behind this concern is geography. As noted earlier, the only thing connecting the residents and business owners on Cypremore Point to the mainland is the Louisa swing bridge. This bridge is the only means of ingress and egress for residents, businesses, and visitors of Cypremore Point. Just as the *Union Oil* Court held that it was foreseeable for an oil spill to disrupt the activities of commercial fishermen, this court finds that it is truly foreseeable that an allision between a barge and the Louisa swing bridge would disrupt the only means of ingress and egress to Cypremore Point, effectively cutting off all means of transportation to and from the Island. Thus, it is this court's opinion that the plaintiffs in the instant action are both foreseeable and proximately situated. It is undoubtedly foreseeable that an allision with the Louisa bridge would result in the exact consequences sued for in this action. In fact, the bridge has been struck before this occasion. A new high rise bridge is under construction and near completion. There is no question that these claimants are so proximately situated so as to give them a right of action against these alleged tortfeasors.

If we are to protect one class of businesses over another, as the Court did in *TESTBANK*, then we must consider how extremely distinguishable these facts are from those of *TESTBANK*. The claimants in this matter are located in very close proximity to the accident site and were all located within the mandatory evacuation zone. Additionally, the damages sustained by these businesses were through no fault of their own and can only be attributable to the acts of Taira Lynn Marine, Kirby Inland Marine, and/or the State of Louisiana through the Department of Transportation and Development.

It is not this court's desire or intention to extend this ruling to potential plaintiffs who are too remote or tenuous to prove that their losses resulted from this incident. As such, this holding does not undermine the *TESTBANK* majority's concerns of the "wave upon wave of successive litigation," the managerial factors set forth in the opinion, or the economic factors that were so heavily analyzed by the *TESTBANK* Court. These motions for summary judgment target a small identifiable group of claimants, and as such, minor managerial factors should not prevent this court from providing justice to all parties.

This court now turns to an evaluation of the controlling *TESTBANK* decision. Again, it is important to point out that the facts of this case are absolutely distinguishable from those in *TESTBANK*. Additionally, the policy considerations of the court in this matter can be distinguished from those examined in the *TESTBANK* decision.

This case presents the court with a very unique factual and geographical situation. Unlike *TESTBANK*, where the potential number of claimants could have been almost endless, this proceeding deals with an identifiable number of potential claimants

(i.e. the businesses on Cypremore Point and in the nearby surrounding areas). In fact, these motions for partial summary judgment only deal with fourteen businesses claiming economic losses. Additionally, the unique geography of the area provides its own limitations on the number of potential claimants. This case does not involve the closure of one of the world's major waterways for an extended period of time. Rather, it deals with the cutting off of Cypremore Point's residents and business owners' lifeline to the mainland. The closure of this lifeline had a significant impact on the way these people live life on a day-to-day basis and conduct daily business operations.

The "managerial" factors which helped drive the *TESTBANK* decision simply do not arise in the instant proceeding. This case does not involve the potential for the "wave upon wave of successive economic consequences," a heightened "managerial role", or the concern that the "resulting decisions would be judicial products only in their draw upon judicial resources." 752 F.2d at 1028–29. This court has determined that the reasoning employed in *TESTBANK,* while it may have been necessary in that particular case, is not applicable here, as this case does not present the concern of "wide open-ended liability." This rationale may have been both workable and necessary in the *TESTBANK* decision, but this court believes that the interests of fairness and justice are better served in this case by allowing these limited, foreseeable and proximately situated claimants to pursue their claims. Moreover, this case does not present the court system with an overriding influx of potential plaintiffs resulting in grave economic consequences, nor would it result in the waste of valuable judicial resources. This court believes that there are cases, such as the one at bar, that are on a much smaller scale than *TESTBANK* and require that

fairness and justice prevail over the desire for predictability and the fear of a litigation tsunami.

This court also finds that the "economic" concerns of *TESTBANK* are not evidenced here. The *TESTBANK* decision was driven by a fear of economic concerns to protect corporations and insurance companies. It is indisputable that *TESTBANK* had major ramifications on maritime commerce and the insurance industry. Allowing the vast number of potential claimants in the action and imposing liability on the tortfeasors in that suit would have virtually imposed liability *ad infinitum* and essentially crippled the maritime industry. Although this court understands the desire of some to protect certain business interests, factors of fairness and equity persuade this court to administer justice, even though those desires may be compromised.

However, the case before the court at this time does not involve these catastrophic injuries and reverberating effects throughout the maritime industry. Simply stated, this case contains a completely different factual scenario, requires different policy considerations, and factors such as fairness, equality and justice should weigh heavily on the conscience of the Court. This court interprets *TESTBANK,* if it is applicable, to apply to large scale cases that could have a crippling effect on maritime commerce. In those cases, the court should weigh all factors; and in the end, economic interests and managerial interests could prevail., In smaller cases which do not have the potentially devastating consequences on maritime commerce or the economy, considerations of fairness and justice must prevail. This court does not believe that a make shift bright line rule which favors predictability should be employed in all cases, especially where the damages are foreseeable.

In *TESTBANK,* Judges Wisdom, Rubin, Politz, Tate and Johnson filed a dissenting opinion. The opening paragraph of the dissent states: *"Robins* is the Tar Baby of tort law in this circuit. And the brier-patch is far away. This court's application of *Robins* is out of step with contemporary tort doctrine, works substantial injustice on innocent victims, and is unsupported by the considerations that justified the Supreme Court's 1927 decision." 752 F.2d at 1035.

While this court thinks that *TEST-BANK* may be workable on large scale cases and may be necessary to some extent to protect the maritime industry; cases such as this, where the damages are clearly foreseeable and the potential economic impacts are not as profound, the doctrine of *TESTBANK* should not apply. *"Robins* prevented plaintiffs who were neither proximately nor foreseeably injured by a tortious act or product from recovering solely by claiming a contract with the injured party. The wisdom of this rule is apparent. This rule, however, has been expanded now to bar recovery by plaintiffs who would be allowed to recover if judged under conventional principles of foreseeability and proximate cause." *Id.* at 1039. This court urges the Fifth Circuit to adopt a rule of law that is more in tune "with refined notions of proximate cause and foreseeability, provides a workable scheme of liability that is in step with the rest of tort law, compensates innocent plaintiffs, and imposes the cost of harm on those who caused it." *Id.* at 1046.

In our analysis of some of the arguments provided by the *TESTBANK* dissent, this court supports the idea set forth by Judges Wisdom, Rubin, Politz, Tate and Johnson that the general test for recovery, for claimants in this situation, should be "whether their business of supplying a vital commodity or service to those engaged in the maritime industry has been interrupted by the collision, the closure, or the embargo." *Id.* at 1050–51. This Court would also take special note of the examples as set forth in the dissenters' opinion:

"Marinas, for example, in the afflicted area should be allowed to recover. If all shipping and boating is suspended, then a marina or drydock in the area affected is unable to supply docking or repair services to users of the waterway ... the same would be true for similarly situated boat charterers who supply marine 'common carrier' services ... bait and tackle shops present a similar situation ... Finally, seafood processors and seafood wholesalers that provide services for the condemned area should recover ... There is a point beyond which we cannot allow recovery ... Basically, a claim for damages that is indistinguishable from a general grievance furnishes no basis for recovery ... Generally, lost profits should be awarded to eligible claimants." *Id.* at 1050–51.

According to the profound wisdom in the dissenting opinion, this workable and equitable rule affords the court many advantages. To paraphrase the crux of the dissenting opinion, this system would provide justice by compensating damaged plaintiffs and placing the costs of damages upon tortfeasors, act in harmony with economic principles of modern tort law, and alleviate courts from having to create exceptions to avoid the harsh effects of *Robins.*

This court would also endorse a geography exception to the overarching *TEST-BANK* decision. There already exists a "commercial fishermen exception" to the "bright-line" rule of *TESTBANK.* This exception is limited to plaintiffs whose economic losses are characterized as "of a particular and special nature." *Id.* at 1026, citing *Union Oil v. Oppen,* 501 F.2d at 570. The Court in *Union Oil* found

that commercial fishermen were foreseeable plaintiffs. The *TESTBANK* Court also applied this limited exception to its "bright line" rule which limits recovery for economic loss to those plaintiffs who have suffered damage to a proprietary interest. The Court held that commercial fishermen were "making a commercial use of the embargoed waters" and afforded them an exception to an otherwise harsh rule of recovery.

This "geographical exception" to the rule of *TESTBANK* is similar to the one carved out for commercial fishermen in that these claimants were making a "commercial use of the embargoed" Louisa bridge. The only way to conduct business, operate a store or marina and travel to and from Cypremore Point was by the use of the Louisa bridge. Just as the water provides livelihood to commercial fishermen, the Louisa bridge is the way in which businesses on the Island open their doors, acquire patrons and conduct business.

This geographical exception has the advantage of being self limiting. It does not involve continuous foreseeability nor does it undermine the policy principles behind *TESTBANK*. Essentially, this exception does not open the floodgates of litigation that *TESTBANK* sought to avoid; the limits on foreseeability are well defined. The bridge is the only way on and off of the island; therefore, a barge colliding with the bridge is a foreseeable event which produces foreseeable consequences. Proximity is also limited by this exception. This exception would only apply to small geographical areas with limited means of ingress and egress dictated by the geography of the particular area in question. It would also resolve the problem of varying results in litigation and liability, providing for more equitable results.

This exception does not allow for "wave upon wave" of litigation or a sea of change, but rather creates a new path for a deserving exception and a reevaluation of our current traffic jam in this intersection of tort law.

## V. ANALYSIS

The claimants that are the target of these motions for summary judgment are: Cajun Wireline, Inc.; North American Salt Company/Carey Salt Company; Coastline Marine, Inc; Pamela Dore d/b/a Cove Marina; Legnon Enterprises, Inc.; Marine Turbine Technologies, L.L.C.; Mason Seafood; CVD Incorporated d/b/a Rohm & Haas Advanced Materials; Morton International, Inc.; Riverfront Seawalls & Bulkheads; Bagala's Quality Oysters, Inc.; Big D's Seafood; Blue Gulf Seafood, Inc.; and Twin Brothers Marine. This Court will address each respectively.

■ Cajun Wireline, Inc. is a full service slick wireline provider which provides both land and marine slick services. Cajun Wireline claims that the marine portion of its business was impacted by the accident and evacuation. Cajun claims that three of its jack up boats could not perform their duties due to the collision and subsequent evacuation of the area. Specifically, the M/V Chevy Elevator was traveling to a job site but had to turn around due to the evacuation; the TIGER was left on location; and the CAJUN II was left in the field jacked up.

If Cajun Wireline is not dismissed on summary judgment, its burden of proof is difficult at best. However, if Cajun Wireline can relate their damage to the accident and subsequent evacuation caused by the defendants, it should have that opportunity. Accordingly, this court denies summary judgment as to Cajun Wireline.

North American Salt Company/Carey Salt Company claims that they had to suspend operations due to the discharge of

the gas into the air and water. They claim that the mining superintendent could smell nauseous odors at the mine and, in turn, ordered an evacuation. North American claims it was physically impacted by the allision as evidenced by the smell of propane/propylene gas in the air and discharge into the water. As a result of the evacuation, North American had to turn off its ventilators so as to protect the mine from contamination. As a result, the mine became very humid and North American could not harvest 34,106 tons of salt which they needed to fulfill two contracts.

The court finds that North American Salt Company/Carey Salt Company have put forth enough evidence to survive the motions for summary judgment filed by the defendants in this matter. In particular, this court is satisfied with the contentions regarding this claimant's smell and fear allegations, as well as the shut down in operations which resulted in the loss of over 34,000 tons of salt. This claimant clearly meets even the most stringent of tests as set out in the *TESTBANK* decision. Therefore, summary judgment is denied as to North American Salt Company/Carey Salt Company.

Coastline Marine's main line of business is pile driving and providing support work for the oil industry, gas industry, pipelines, salt mines, and sugar mills, as well as performing dock repairs, erosion control, dredging and concrete construction. Coastline claims that 50 to 60 percent of its work is marine work. However, Coastline claims that due to the evacuation, they could not perform work on their contracts, in particular its contract with Morton Salt. Coastline claims that it could not perform other contracts because its personnel and equipment were tied up due to the evacuation. If Coastline Marine is not dismissed on summary judgment, this court recognizes that its burden of proof is difficult at best. However, if Coastline Marine can relate their damage to the accident and subsequent evacuation caused by the defendants, it should be afforded that opportunity. Accordingly, this court denies summary judgment as to Coastline Marine.

Pamela Dore d/b/a Cove Marina is a convenience store which sells groceries, had a deli, sold fuel, live bait, fresh bait, dry bait and artificial bait and provided dry boat storage and RV parking. Pamela Dore claims loss of revenues and sales as a result of the evacuation. The court finds that Pamela Dore d/b/a Cove Marina will have a difficult time carrying her burden of proof for damages, but that she will be afforded her in court. Accordingly, summary judgment is denied as to Pamela Dore d/b/a Cove Marina.

Legnon Enterprises sells marine supplies, food, beer, hardware, electrical supplies, bait, ice and rents camps. Legnon also has a deli which serves food and has a charter fishing boat and a shrimp boat. Legnon claims that due to the accident and subsequent evacuation, it was denied access to its business and could not charter trips for two days. Legnon claims lost charter revenues as well as lost sales and revenues due to the island being shut down. This Court finds that there are sufficient issues of material fact so as to deny summary judgment against Legnon Enterprises. Legnon's claims will be adjudicated in court, not dismissed on summary judgment.

Marine Turbine Technologies claims that it suffered physical damage in the form of toxic gas permeation on its property. This Court finds that Marine Turbine Technologies has put forth enough evidence as to issues of material fact on the physical damage claims so as to survive these motions for summary judgment,

even if the most stringent rule of *TEST-BANK* is applied.

Mason Seafood claims it lost an order of 88 boxes of dressed crabs which spoiled in the freezer when they lost electricity during the evacuation. Mason Seafood survives summary judgment because it meets the strict physical damage rule handed down in *TESTBANK*.

Morton International owns property on Weeks Island which was within the mandatory evacuation zone. On that property, Morton operated a salt mining facility and through its wholly owned subsidiary, CVD Inc., d/b/a "Rohm and Haas Advanced Materials", operated a plant engaged in chemical vapor deposition operations. The salt operation included a rock salt mine and an evaporation plant. Morton claims that it began to shut down operations before the mandatory evacuation order was issued. As a result, Morton was able to avoid damage to its equipment and products. Morton claims that it should be allowed to recover because it mitigated its own damages by shutting down operations before the mandatory evacuation was ordered by the Louisiana State Police. Morton's contends that it should not be punished for limiting the extent of possible damages by acting as a careful and prudent business entity. Morton's also contends that damage to a commercial enterprise was a foreseeable consequence of the allision between the barge and the bridge.

Advanced Materials is a chemical vapor deposition facility which manufactures material used to manufacture specialty lenses for missiles and materials used on tanks, military planes, airborne night vision windows, outer space satellites, as well as ball bearings, wafer plates and computer components. At the time of the allision, two manufacturing runs were being conducted in two customized furnaces. As a result of the allision, the manufacturing runs had to be prematurely terminated and the materials in those runs were lost and the products were unable to be sold. CVD claims that once a run is terminated, it cannot be reinstated due to the precision requirements in its operations. Consequently, all of the materials that were in use were lost. Thus, CVD meets the proprietary interest requirement. CVD Incorporated d/b/a Rohm & Haas Advanced Materials and Morton International survive summary judgment since they clearly meet the physical damage requirement of *TESTBANK*.

Riverfront Seawalls and Bulkheads is in the business of building bulkheads. Coy Reeks claims that he had to leave his equipment on the island during the evacuation. As a result, he could not work on any other jobs during the evacuation and was unable to work for one week. While its ability to prove its claim may be limited, this court is not satisfied that Riverfront Seawalls and Bulkheads cannot meet its burden of proof and therefor should have its day in court. Summary judgment is denied as to Riverfront Seawalls and Bulkheads.

Bagala's buys and sells wholesale oysters. It also operates oyster boats. Due to the allision and evacuation, Bagala's claims that it lost commission on oysters that they would have purchased from contract boats that were at its dock. Bagala's claims losses for the inability to fish oysters. Bagala's Quality Oysters, Inc. survives summary judgment because it falls under the commercial fishermen exception to *Robins* and its progeny.

Big D's Seafood is a wholesale seafood business. The business is located within three-quarters of a mile from the Louisa bridge and was forced to evacuate. Douglas Olander, one of the owner's of Big D's Seafood, claims that he could see the gas and smell the fumes in the air that resulted from the allision in question. As a

result of the gas, Big D's had to decontaminate various pieces of equipment and rinse off and re-ice fish. Big D's also has a commercial fishing business in which they fish trout lines, crab traps and trawl. Big D's is claiming losses for decontamination and the loss of the ability to fish in the surrounding waters. In particular, Big D's is claiming lost crab traps, trout lines, other gear, as well as gas expenses for a boat and vehicle. Big D's Seafood also survives summary judgment because it falls under the commercial fishermen exception to *TESTBANK* and alleges physical damage claims so as to satisfy *TESTBANK*.

Blue Gulf Seafood, Inc. buys and sells oysters from its own boats as well as other boats. Blue Gulf claims that it lost 206 sacks of oysters as a result of the collision and evacuation. Blue Gulf also had to close its business for four days due to the collision. Blue Gulf Seafood, Inc. falls under the commercial fishermen exception to the law of this Circuit and also alleges physical damage.

Twin Brothers Marine owns a fabrication and dock facility at the Port of West St. Mary Parish. It is primarily engaged in fabricating offshore platforms and jackets for use in the oil and gas industry. As a result of the allision, Twin Brothers was forced to halt work in progress for two construction projects. Thus, they claim economic damages as a result of halting this work. Additionally, Twin Brothers Marine has a breach of contract claim against Kirby Inland Marine. The president of Kirby entered into an agreement with Twin Brothers Marine for the use of Twin Brothers' dock facilities, equipment and personnel to repair the damage to Kirby barge 31801. Twin Brothers contends that Kirby agreed to provide liability insurance coverage to Twin Brothers while the repairs were being completed. Twin Brothers claims breach of contract in that Kirby has failed to reimburse Twin Brothers for its costs, losses and damages as provided for in the agreement of July 22, 2001. This court finds that the ability of Twin Brothers Marine to carry its burden of proof on its claims for economic loss is difficult, however if it can relate its damage to the accident and evacuation, it should have its day in court. This court also finds that the claim for breach of contract by Twin Brothers Marine against Kirby still stands.

## VI. CONCLUSION

In all court proceedings, it is up to the aggrieved party asserting his claim to prove that this particular tortfeasor's action caused the damages alleged. In civil cases, this must be proven by a preponderance of the evidence. To arbitrarily and without legislative authority protect such a tortfeasor goes beyond judicial bounds. The legislature, and not the judiciary, should determine immunity from prosecution and liability.

Furthermore, when a cause of action sounds solely in tort, tort law and not contract law should apply. Professor Thomas C. Galligan noted this in his article entitled "Contortions Along The Boundary Between Contracts and Torts" that "Supposedly in denying recovery, we are relying on contract processes to operate in such a way that contracts, rather than torts, will take care of such damages. But if we have parties who suffer economic losses from the tort that are not caused by the breach of an upstream contract, perhaps they ought to be allowed to recover in tort." 69 TLNLR 457, 519 (1994). This court finds that this cause of action lies in principles of tort law. Accordingly, tort principles of foreseeability and proximate cause should govern. This court cannot bring itself to mandate that the only re-

course an injured business can have against a wrongdoer is to protect its interests by purchasing insurance based on the fear that a negligent action by a tortfeasor would result in the closure of its business for a few days.

This court finds that not all of the claimants targeted by these motions for summary judgment are purely economic loss claimants. Accordingly, those claimants who allege physical damage to a proprietary interest undoubtedly survive these motions for summary judgment. Moreover, the claimants alleging economic loss should be allowed their day in court. *TESTBANK* is neither a workable solution to the problem posed to this court, nor is it an equitable one. The limited number of claimants in this matter are both foreseeable and proximately situated to the scene of the accident. Therefore, the facts of this case are distinguishable from *TEST-BANK* and if all of the elements of the claimants' case are proven by a preponderance of the evidence, they should recover. If not, the claimants should not recover. This court denies summary judgment as to all of the "economic loss" claimants in the instant proceeding.

Additionally, this court finds that the OPA 90 and CERCLA claims are not ripe for summary judgment. These claims raise genuine issues of material fact and are also outside of the scope of the discovery provisions as set out by Magistrate Hill's order. The motions to dismiss the Oil Pollution Act of 1990 and the CERCLA claims are hereby denied.

This court will sign a formal judgment consistent with these reasons to be prepared and approved by all counsel.