993 So.2d 1078 (2008)
Howard CURD, Floyd Deforest, Scott Mobley, Gary Bruce, David Laggner, Bryan Ibasfalean, Philip Johnson, and Angelo Logrande, on behalf of themselves and all others similarly situated, Appellants,
v.
MOSAIC FERTILIZER, LLC, Appellee.
No. 2D07-352.
District Court of Appeal of Florida, Second District.
September 17, 2008.
F. Wallace Pope, Jr., of Johnson, Pope, Bokor, Ruppel & Burns, LLP, Clearwater; and Andra T. Dreyfus of Andra Todd Dreyfus, P.A., Clearwater, for Appellants.
Kimberly S. Mello and David B. Weinstein of Greenberg Traurig, P.A., Tampa, for Appellee.
ALTENBERND, Judge.
Howard Curd and several other commercial fishermen (the fishermen) appeal an order dismissing their proposed class action lawsuit against Mosaic Fertilizer, *1079 LLC. The fishermen claim that Mosaic's phosphogypsum storage facility polluted the waters of Tampa Bay, reducing the available supply of fish, which in turn damaged their businesses and reduced their income. We agree with the trial court that the fishermen's fourth amended complaint failed to state a cause of action and affirm the order on appeal. Because we conclude that the issue of whether commercial fishermen may recover economic losses arising from the release of pollution in Florida waters, either under principles of common law negligence or under section 376.313, Florida Statutes (2004), is a matter of great public importance, we certify two questions to the Florida Supreme Court:
DOES FLORIDA RECOGNIZE A COMMON LAW THEORY UNDER WHICH COMMERCIAL FISHERMEN CAN RECOVER FOR ECONOMIC LOSSES PROXIMATELY CAUSED BY THE NEGLIGENT RELEASE OF POLLUTANTS DESPITE THE FACT THAT THE FISHERMEN DO NOT OWN ANY PROPERTY DAMAGED BY THE POLLUTION?
DOES THE PRIVATE CAUSE OF ACTION RECOGNIZED IN SECTION 376.313, FLORIDA STATUTES (2004), PERMIT COMMERCIAL FISHERMEN TO RECOVER DAMAGES FOR THEIR LOSS OF INCOME DESPITE THE FACT THAT THE FISHERMEN DO NOT OWN ANY PROPERTY DAMAGED BY THE POLLUTION?
According to the allegations in the fishermen's complaint, Mosaic owned or controlled a phosphogypsum storage area near Archie Creek in Hillsborough County. The storage area included a pond enclosed by dikes, containing wastewater from a phosphate plant. This wastewater allegedly contained pollutants and hazardous contaminants.
The fishermen alleged that in the summer of 2004, the Hillsborough County Environmental Protection Commission and the Florida Department of Environmental Protection both warned Mosaic that the quantity of wastewater in the storage facility was dangerously close to exceeding the safe storage level. According to the complaint, on August 10, 2004, the Department of Environmental Protection warned Mosaic that a 100-foot section of the pond dike was three feet narrower than the minimum required width of 18 feet. It warned that only an inch or two of additional rain during the tropical season would raise the level of pollutants in the pond to the top of the dike. On September 5, 2004, the dike gave way and pollutants were spilled into Tampa Bay.
The fishermen claim that the spilled pollutants resulted in a loss of underwater plant life, fish, bait fish, crabs, and other marine life. They do not claim an ownership in the damaged marine and plant life, but claim that it resulted in damage to the reputation of the fishery products the fishermen are able to catch and attempt to sell. At least implicitly, they are alleging monetary damages in the nature of lost income or profits.
The complaint included three counts. Count 1 attempted to allege a claim for statutory liability under section 376.313(3), Florida Statutes (2004). Count 2 alleged common law strict liability based upon damages resulting from Mosaic's use of its property for an ultrahazardous activity. See, e.g., Cities Serv. Co. v. State, 312 So.2d 799 (Fla. 2d DCA 1975). Count 3 alleged a claim of simple negligence. The trial court concluded that the language in chapter 376 did not permit a claim by these fishermen for monetary losses when they did not own any real or personal property damaged by the pollution. After initially permitting the fishermen to proceed *1080 on their claims of negligence and strict liability, the trial court ultimately ruled that these claims were not authorized under the economic loss rule. The fishermen then appealed the dismissal of their entire fourth amended complaint to this court. We begin by addressing the fishermen's tort claims, those sounding in negligence and strict liability, which we conclude are barred by the economic loss rule and general principles of tort law.

I. THE FISHERMEN CANNOT STATE A CLAIM IN NEGLIGENCE OR STRICT LIABILITY TO RECOVER FOR PURELY ECONOMIC LOSSES UNRELATED TO INJURY TO THEIR PERSONS OR PROPERTY
The trial court dismissed the negligence and common law strict liability claims within the fourth amended complaint, relying on case law discussing the economic loss rule. The fishermen argue that the Florida Supreme Court's opinion in Indemnity Insurance Co. v. American Aviation, Inc., 891 So.2d 532 (Fla.2004), has narrowed the scope of the economic loss rule and limited its application to only two scenarios, neither of which apply to their complaint. Although we recognize that the supreme court's opinion limits the application of the economic loss rule as defined in the opinion, we do not read the opinion as entirely overriding the general principle that recovery in negligence is not usually permitted for purely economic losses unconnected to injury to persons or property.
In American Aviation, American Aviation performed an inspection and maintenance on an aircraft and certified its work in the aircraft's logbook. The aircraft was then purchased by Profile Aviation Services, Inc., a company apparently insured by Indemnity Insurance Company. According to Profile's complaint, American Aviation improperly installed a critical component of the airplane and the error severely damaged the aircraft in a subsequent landing. Profile and Indemnity Insurance sought to recover the economic damages they sustained from American Aviation's error by filing a complaint in federal district court against American Aviation alleging negligence, negligence per se, negligent misrepresentation, and breach of warranty. Notably, Profile had no contractual relationship to American Aviation, and thus the warranty claim failed. 891 So.2d at 535-36.[1]
The federal district court concluded the claims were barred by Florida's economic loss rule. Profile and Indemnity Insurance appealed to the Eleventh Circuit Court, which in turn certified to the Florida Supreme Court five questions intended to determine the extent to which the economic loss rule might apply to these facts. Id.
The supreme court began its analysis of the economic loss rule with a broad definition, stating, "The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses," which the court defined as "simply put, disappointed economic expectations." Id. at 536, 536 n. 1. The court continued:
In this state, the economic loss rule has been applied in two different circumstances. The first is when parties are in contractual privity and one party seeks to recover damages in tort for matters *1081 arising from the contract. The second is when there is a defect in a product that causes damage to the product but causes no personal injury or damage to other property.
Id. at 536. The court labeled these two applications as the "contractual privity economic loss rule" and the "products liability economic loss rule." The court then explained the theories and policies underlying these two applications. Id. at 536-38.
The court noted that the case before it involved neither a products liability scenario nor parties in contractual privity. Rather, the court compared the situation in American Aviation to the virtually identical scenario presented in a prior Third District case, Palau International Traders, Inc. v. Narcam Aircraft, Inc., 653 So.2d 412 (Fla. 3d DCA 1995), and then likened both cases to Moransais v. Heathman, 744 So.2d 973 (Fla.1999), a prior case in which the Florida Supreme Court had refused to apply the economic loss rule to prohibit recovery. Moransais involved a professional negligence action brought against an engineer who made a pre-purchase inspection of a home and whose report the buyers relied upon, even though they were not in privity with the engineer. Notably, each of the cases discussed in this portion of the American Aviation opinion involved the provision of services, either by a professional or by a business entity holding themselves out as competent in their chosen enterprise, and acting in a manner that would foreseeably induce reliance upon their work by third parties.
After reviewing these three scenarios, the court concluded, "We now agree that the economic loss rule should be expressly limited." American Aviation, 891 So.2d at 542. The express limitation recognized and applied the economic loss rule only in two forms, the "contractual privity economic loss rule" and the "products liability economic loss rule." Further, the court expressly confirmed that even if a case involved contractual privity or a defective product, the rule would not prevent recovery for intentional torts such as fraud, conversion, intentional interference, civil theft, and abuse of process; or for other recognized exceptions such as professional malpractice, fraudulent inducement, negligent misrepresentation,[2] or freestanding statutory causes of action. Id. at 543, 543 n. 3.
The fishermen interpret the reasoning in American Aviation as a syllogism that applies to their case. That is, the fishermen reason that they are not in contractual privity with Mosaic and that they are not complaining of losses due to a defective product, ergo, the economic loss rule does not apply to them. Similar reasoning is reflected in a Third District case applying American Aviation. See Biscayne Inv. Group, Ltd. v. Guarantee Mgmt. Servs., Inc., 903 So.2d 251 (Fla. 3d DCA 2005) (concluding economic loss rule did not bar claims by a developer alleging economic losses due to actions of management company *1082 hired by homeowners' association because parties were not in privity and defective product was not at issue).
Prior to the decision in American Aviation, however, this court and other courts often observed that the term "economic loss rule" was applied in some contexts simply as a restatement of the common law principle that the law regarding negligence generally protects interests in the safety of person and property. See e.g., Monroe v. Sarasota County Sch. Bd., 746 So.2d 530, 533 (Fla. 2d DCA 1999); Sandarac Ass'n v. W.R. Frizzell Architects, Inc., 609 So.2d 1349, 1352 (Fla. 2d DCA 1992).[3] Under the reasoning employed in this line of cases, the fishermen have sustained no bodily injury or property damage that would permit an action in common law either through strict liability or negligence. The fishermen do not fall into any recognized exception to the general principle discussed in that case law. Thus, the question is whether the supreme court in American Aviation intended to overrule these cases and perhaps the underlying common law principle supporting them.
In American Aviation, Justice Pariente's opinion for the court recognized that its holding, which narrowed the scope of the economic loss rule, was not intended to alter the application of "traditional negligence principles of duty, breach, and proximate cause" to cases that do not involve either a contractual relationship or defective products. 891 So.2d at 543. In his concurrence, Justice Cantero also emphasized that the narrowing of the scope of the economic loss rule was not intended to diminish the use of "the duty element" as "a strong filter . . . virtually as strong as the rule itself" in cases that fell outside the economic loss rule. Id. at 546-47.
Only one sentence in the majority opinion in American Aviation gives us pause. Justice Pariente stated: "We further conclude that, in general, actionable conduct that frustrates economic interests should not go uncompensated solely because the harm is unaccompanied by any injury to a person or other property." Id. at 543. Although this statement appears superficially to be broad, we note it is qualified by the term "actionable conduct." In general, "conduct" has not generally been "actionable" under the common law unless it involved (a) an intentional tort, (b) a claim for professional malpractice, or (c) negligence causing bodily injury or property damage.[4] To this list we may now add (d) the negligent provision of services resulting in foreseeable economic losses by those who might reasonably rely upon the service provided, even though they are not in contractual privity with the service provider.[5]
*1083 Taken together, Justice Pariente's assurance that the narrowed scope of the economic loss rule was not intended to disrupt traditional principles of negligence law and Justice Cantero's concurrence regarding the continued import of the duty prong as a "strong filter" in negligence cases convinces us that the opinion in American Aviation cannot be read as broadly as the fishermen suggest. Rather, we conclude that under traditional principles of negligence, whether entitled "the economic loss rule" or not, the fishermen failed to state a cause of action.
The fishermen concede that as private citizens they do not own a property interest in the fish because any ownership interest in these natural resources resides with the State. See McCready v. Virginia, 94 U.S. 391, 24 L.Ed. 248 (1876); see also art. IV, § 9, Fla. Const. (vesting regulatory authority and executive powers of the state over marine life to the Fish and Wildlife Conservation Commission). The complaint did not allege any bodily injury to the fishermen. The negligence and strict liability claims seek purely economic damages unrelated to any damage to the property of the fishermen. Simply put, Mosaic did not owe an independent duty of care to protect the fishermen's purely economic intereststhat is, their expectation of profits from fishing for healthy fish.

II. THE FOURTH AMENDED COMPLAINT FAILED TO ALLEGE A RECOGNIZED CLAIM UNDER CHAPTER 376
The fishermen's final claim is a statutory claim under section 376.313(3). The supreme court has held that statutory causes of action such as this cannot be defeated by application of common law rules such as the economic loss rule. See Comptech Int'l, Inc. v. Milam Commerce Park, Ltd., 753 So.2d 1219, 1222 (Fla.1999) ("It is undisputed that the Legislature has the authority to enact laws creating causes of action. If the courts limit or abrogate such legislative enactments through judicial policies, separation of powers issues are created, and that tension must be resolved in favor of the Legislature's right to act in this area."). Thus, the analysis of this claim rests simply on statutory interpretation, examining whether the legislature intended in section 376.313(3) to provide fishermen a cause of action for their economic losses due to pollution.
Chapter 376 regulates the discharge of pollution. The first portion of this chapter was enacted in 1970 as the "Oil Spill Prevention and Pollution Control Act." See ch. 70-244, Laws of Fla. The legislature expanded the reach of chapter 376 when it enacted the Water Quality Assurance Act of 1983, ch. 83-310, Laws of Fla. Section 84 of chapter 83-310 effectively created a private cause of action for damages caused by pollution. Ch. 83-310, § 84, at 1885, Laws of Fla. This provision is currently codified in section 376.313(3).
Section 376.313(3) reads:
Except as provided in s. 376.3078(3) and (11), nothing contained in ss. 376.30-376.319 prohibits any person from bringing a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution. . . . Except as otherwise provided in subsection (4) or subsection (5), in any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.
In Aramark Uniform & Career Apparel, Inc. v. Easton, 894 So.2d 20 (Fla.2004), the Florida Supreme Court held that this provision created a private cause of action by *1084 "creating a damages remedy for the non-negligent discharge of pollution without proof that the defendant caused it." Id. at 24. The question that remains unsettled, both in the statute and the case law, is what type of damages are recoverable under the statute and by whom.
The fishermen argue that the phrase "all damages" in this context is not defined and should include the economic losses that they have suffered indirectly as a result of the pollution, even if they do not own physical property that has been damaged or that requires cleanup. Effectively, the fishermen argue for a broad "foreseeability" type of analysis. However, if this statute were given the expansive interpretation suggested by the fishermen, it would be very difficult to decide when damages were so remote that they were no longer damages. In this case, for example, a sizable fish kill not only reduces the take for fishermen, but it causes other damage. The fishermen buy fewer supplies. Restaurants and stores pay higher prices for fish, which usually results in decreased sales or decreased profits. If the dead fish end up on beaches, various businesses sustain losses. All of these damages are foreseeable to a person envisioning the most remote economic consequences arising from a sizable fish kill.[6] We are unwilling to assume, in the absence of express language stating such intent, that the legislature intends the courts to use such an expansive method to measure recoverable damages under this statutory action.
There is no doubt that Aramark permits a neighboring landowner to recover damages caused by contamination to his or her land by pollution originating on the adjoining property. The existing case law suggests such damages would include at least the cost of removing the pollutants or other remediation. See Kaplan v. Peterson, 674 So.2d 201 (Fla. 5th DCA 1996); Italiano v. Jones Chems., Inc., 908 F.Supp. 904, 906 (M.D.Fla.1995); see also Boardman Petroleum, Inc. v. Tropic Tint of Jupiter, Inc., 668 So.2d 308 (Fla. 4th DCA 1996). There is also case law interpreting the statute as permitting recovery for personal injury caused by contamination. See Cunningham v. Anchor Hocking Corp., 558 So.2d 93 (Fla. 1st DCA 1990). There is no precedent, however, permitting a recovery for damages under the statute when the party seeking the damages does not own or have a possessory interest in the property damaged by the pollution.
In the absence of express language stating such an intent, we are unable to conclude that the legislature intended the courts to use such an expansive method to measure recoverable damages under this statute. While courts cannot abrogate or defeat statutory causes of action by applying common-law rules, the legislature itself often creates statutory causes of action with an eye toward the common law. In section 376.313(3), the legislature did not directly state that it was creating a cause of action; it explained that "nothing contained" in the statute "prohibits any person from bringing a cause of action." If the legislature had actually intended this statute to create a wide array of claims by people indirectly affected by pollution, we *1085 believe the legislature would have been more direct and obvious about its intent.[7]

III. A SPECIAL CAUSE OF ACTION FOR FISHERMEN
The fishermen argue that this court should recognize their claim for damages, either in tort law or under the statute, because of their unique relationship with the fish or because they hold commercial fishing licenses. Again, the fishermen rely on a broad foreseeability analysis to seek recovery of purely economic damages.
There is no Florida precedent to support the fishermen's theory. In a few other states where commercial fishing is a significant part of the local economy, courts have held that commercial fishermen may recover economic losses resulting from oil spills and other major releases of pollutants. See, e.g., Union Oil Co. v. Oppen, 501 F.2d 558, 570 (9th Cir.1974) (stating offshore oil producers owe a duty to commercial fishermen to avoid the negligent diminution in marine life when fishermen demonstrated the oil spill directly reduced income from previous profits); Louisiana, ex rel. Guste v. M/V Testbank, 524 F.Supp. 1170, 1173 (E.D.La.1981) (allowing a limited claim for commercial fishermen for the "tortious invasion of commercial fishing areas by the introduction of pollutants or contaminants" in specific affected areas); Burgess v. M/V Tamano, 370 F.Supp. 247, 250 (S.D.Me.1973) (recognizing commercial fishermen could sue for a tortious invasion of a public right after an oil spill interfered with the special interest in exercising the public right to fish and dig clams).[8]
We do not rule out the possibility that the legislature could give commercial fishermen special rights in this context, but this court declines to read this intent into section 376.313(3) or to provide this right as a matter of tort law. There is no question that the law, both statutory and common law, can and has been used as a method to require business ventures to pay for indirect costs of the business that otherwise would be borne by others. The theory of using the law to internalize the externalities of a business is a well-discussed idea among those who study law and economics. However, it is particularly difficult for a common law court to create a carefully tailored and limited theory of recovery for a special group such as fishermen without creating more problems than it solves.[9] This court is unconvinced that *1086 such a special theory for a narrow subset of the people who are indirectly or remotely injured by pollution should be established under the common law method.
Finding no support for the fishermen's claim that they are entitled to recover for their economic losses absent injury to their persons or property, we affirm the trial court's order dismissing their claims. We recognize, however, that this conclusion is based upon general negligence principles and the interpretation of section 376.313(3), with regards to matters that are subject to some dispute. We conclude that the resolution of this case, given its potential impact on the economy of this state, engenders two questions of great public importance. In order to give the supreme court discretion to consider this issue, we certify the two questions of great public importance stated at the beginning of this opinion.
Affirmed; questions certified.
SALCINES, E.J., Senior Judge, Concurs.
CANADY, CHARLES T., Associate Judge, Dissents.
NOTES
[1] It is unclear from the Florida Supreme Court's opinion who contracted with American Aviation to perform the inspection or whether Profile would have had any cause of action against them related to the purchase of the aircraft.
[2] Negligent misrepresentation would presumably include liability under section 552, Restatement (Second) of Torts (1997). This section, which permits recovery for pecuniary losses suffered by persons who reasonably rely upon false information provided by someone acting in the course of their business, profession, and employment, has been adopted and applied by the Fourth District. See Russell v. Sherwin-Williams Co., 767 So.2d 592, 594 (Fla. 4th DCA 2000); Hewett-Kier Constr., Inc. v. Lemuel Ramos & Assocs., 775 So.2d 373, 375 (Fla. 4th DCA 2000). But see Vesta Constr. & Design, L.L.C. v. Lotspeich & Assocs., 974 So.2d 1176 (Fla. 5th DCA 2008) (concluding that if the "contractual privity economic loss rule" discussed in American Aviation foreclosed suit against environmental assessment company, plaintiff could not subvert application of the rule by pursuing a claim against company's employee who performed the assessment).
[3] In this respect, "negligence" is generally directed at "simple negligence." It would not include intentional torts such as fraud or civil theft, nor would it apply to purely statutory causes of action.
[4] This issue is similar to the long-standing debate over the "impact doctrine" that bars claims for most bodily injuries in the absence of an impact. Despite many efforts to overrule this well-established doctrine, as explained by the supreme court in an opinion after American Aviation, conduct that causes bodily injury is not generally actionable in the absence of a physical impact. See Willis v. Gami Golden Glades, LLC, 967 So.2d 846, 850 (Fla.2007).
[5] In Sandarac, the author of this opinion suggested that a broader recognition of third-party beneficiary status under existing contract law might provide a more controllable approach to some economic loss claims than expanding negligence and strict liability law to protect interests beyond their traditional realm, i.e., bodily injury and property damage. 609 So.2d at 1353-54. Sixteen years later, that suggestion is still tempting to the author.
[6] The complexity of this problem is similarly illustrated in Pruitt v. Allied Chemical Corp., 523 F.Supp. 975 (E.D.Va.1981). In that case, the parties conceded that commercial fishermen had sufficiently direct damages to permit recovery for their loss of profits associated with pollution, but the court was left to consider whether sports fishermen; seafood wholesalers, retailers, distributors and processors; restaurateurs; boat tackle and bait shop owners; and employees of all of these groups, similarly suffered a compensable economic loss. See also Union Oil Co. v. Oppen, 501 F.2d 558 (9th Cir.1974).
[7] In other states, for example, the fishermen's claims would be directly permitted by statutes similar to, but more specific than, Florida's Oil Spill Prevention and Pollution Control Act. See, e.g., Adams v. Star Enter., 51 F.3d 417, 425 (4th Cir.1995) (quoting Virginia Code Annotated § 62.1-44.34:18(C)(4) which permits recovery for damages caused by discharge of oil into or upon state waters including "injury or damage to person or property, real or personal, loss of income, loss of the means of producing income, or loss of the use of the damaged property for recreational, commercial, industrial, agricultural, or other reasonable uses"); Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 626 (1st Cir. 1994) (quoting Rhode Island General Law §§ 46-12.3-2, 46-12.3-3, which permitted recovery for economic loss "if the person can demonstrate the loss of income or diminution of profit to a person or business as a result of damage to the natural resources of the state").
[8] See also In re Exxon Valdez, 767 F.Supp. 1509 (D.Alaska 1991); Blue Gulf Seafood, Inc. v. TransTexas Gas Corp., 24 F.Supp.2d 732 (S.D.Tex.1998); Shaughnessy v. PPG Indus., Inc., 795 F.Supp. 193 (W.D.La.1992).
[9] Because the fish are a natural resource of the state, it is conceivable that the legislature could establish a monetary charge to polluters who damage fish based on the size of the fish kill with the proceeds used to fund a program to assist fishermen and other people who lose income from the fish kill. Such a solution, of course, is well beyond the authority of a court.