POLSTON, J.,
concurring in part dissenting in part.
I respectfully concur in part and dissent in part. Although I use different reason *1229 ing, I agree with the majority’s affirmative answer to the certified question of whether commercial fishermen can recover damages for their loss of income pursuant to section 376.313, Florida Statutes (2004). However, I disagree with the majority’s affirmative answer to the certified question of whether, under the facts of the case, commercial fishermen can recover economic losses proximately caused by the negligent release of pollution under Florida common law.
As an initial matter, I note that the majority decides the case for a more narrow class than those bringing the suit and more narrowly than the claims they allege. Although Curd’s proposed class consists of “all fishermen and those persons engaged in the commercial catch and sale of fish,”[7] the majority’s decision does not extend to distributors, seafood restaurants, fisheries, fish brokers, or the like whose incomes may have been affected by Mosaic’s pollution. Additionally, the majority only addresses economic harm that resulted from the depletion of marine life and the resulting inability to harvest the commercial fishermen’s usual yield-not from harm to reputation as alleged in the petitioner’s complaint and mentioned by the Second District Court of Appeal. Compare majority op. at 1228 (discussing the diminution of aquatic life because of pollution) with Curd v. Mosaic Fertilizer, LLC, 993 So.2d 1078,1079 (Fla. 2d DCA 2008) (noting that Curd asserts damage to reputation of fishery products); Petitioner’s Fourth Amended Complaint (alleging loss of plant life, loss of fish and the resulting loss of revenue from inability to harvest fish, loss of crabs and other marine life, and damage to reputation of fishery products). Because the majority opinion does not extend to other class members beyond the commercial fishermen and does not extend to reputation damages, I do not address them.
I. STATUTORY LIABILITY
I agree with the majority that section 376.313(3) provides the commercial fishermen with a strict liability private cause of action. See Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So.2d 20, 28 (Fla.2004) (holding that section 376(313(3) creates a strict, liability cause of action).
As the Second District noted, chapter 376 contains two separately enacted antipollution laws. Curd, 993 So.2d at 1083. The first portion of chapter 376 was enacted in 1970 as the “Oil Spill Prevention and Pollution Control Act” and is currently codified in sections 376.011 through 376.21, Florida Statutes (2004).[8] See ch. 70-244, Laws of Fla. The 1970 enactment provides a cause of action for parties harmed by pollution of coastal waters and lands. See § 376.021, Fla. Stat. (2004) (entitled “Legislative intent with respect to pollution of coastal waters and lands”); § 376.041, Fla. Stat. (2004) (“The discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the state in the manner defined by ss. 376.011-376.21 is prohibited.”).
This 1970 enactment concerns pollution of the coastal waters, and the Legislature included a restrictive definition of damages, applicable only to the 1970 enactment. Specifically, section 376.031(5), Florida Statutes (2004), defines “Damage” as “the documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to s. 376.121, of any destruction of the environment and natural resources, in- *1230 eluding all living things except human beings, as the direct result of the discharge of a pollutant.” The Legislature specified in section 376.031 that the definition only applies to sections 376.011 through 376.21, namely the 1970 enactment. See § 376.031, Fla. Stat. (2004) (“When used in ss. 376.011-376.21, unless the context clearly requires otherwise, the term-”).
In 1983, the Legislature expanded the reach of chapter 376 by enacting the “Water Quality Assurance Act,” which is currently codified in sections 376.30 through 376.319, Florida Statutes (2004). See ch. 83-310, Laws of Fla. While the 1970 enactment created a remedy for those harmed by the pollution of coastal waters, the 1983 enactment provides a cause of action for those harmed by pollution of ground and surface waters. See § 376.30, Fla. Stat. (2004) (entitled “Legislative intent with respect to pollution of surface and ground waters”); § 376.302(l)(a), Fla. Stat. (2004) (prohibiting the discharge of “pollutants or hazardous substances into or upon the surface or ground waters of the state”).
In contrast to the 1970 enactment, the 1983 enactment does not include a restrictive definition of damages. Instead, the 1983 enactment, which relates to ground and surface water pollution, provides for the recovery of “all damages.” Specifically, section 376.313(3), Florida Statutes (2004) (emphasis added), states that “nothing ... prohibits any person from bringing a cause of action ... for all damages resulting from a discharge or other condition of pollution covered by ss. 376.30-376.319.”
Curd filed his statutory cause of action relating to the pollution of surface and ground water under section 376.313 of the 1983 enactment.[9] Therefore, the “all damages” language of the 1983 enactment applies in this case, not the more restrictive definition of the 1970 enactment.
The plain meaning of “all damages” includes economic damages; and the Legislature has directed that section 376.313(3) be liberally construed. See § 376.315, Fla. Stat. (2004) (“Sections 376.30-376.319 ... shall be liberally construed to effect the purposes set forth under ss. 376.30-376.319.... ”). Consequently, the statute provides commercial fishermen (among others) with a private cause of action. If the statute is overly broad as suggested by the Second District,[10] that is an issue for the Legislature to address.
II. COMMON LAW LIABILITY
I disagree with the majority’s holding that those responsible for pollution of ocean waters have a common law duty to protect the purely economic interests of those negatively affected by contamination of the sea. Unlike the majority, I do not believe that under Florida common law commercial fishermen have a unique or special interest that creates a duty to protect their purely economic interest in a healthy ocean.
As the majority explains, four elements are necessary to sustain a negligence claim: duty, breach of the duty, legal causation, and actual damages. See majority op. at 1227-28 (citing Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003)). In 2004, this Court abrogated the *1231 traditional tort requirement of personal or property damage. See Indemnity Ins. Co. v. Am. Aviation, Inc., 891 So.2d 582, 543 (Fla.2004) (limiting the personal and property damage requirement to cases involving contractual privity or product defect and stating that “in general, actionable conduct that frustrates economic interests should not go uncompensated solely because the harm is unaccompanied by any injury to a person or other property”). Because the personal and property damage requirement no longer functions as a filter for unreasonable claims, the function of the duty element of negligence takes on a greater role to filter out the unwarranted claims. See Am. Aviation, 891 So.2d at 547 (Cantero, J., concurring) (stating that the duty element of traditional negligence should filter out undeserving claims that the personal and property damage requirement would have eliminated). Stated another way, “where the recovery of economic losses is sought on a theory of negligence, the.concept of duty as a limiting principle takes on a greater importance than it does with regard to the recovery of damages for personal injury or property damage.” Onita Pac. Corp. v. Trs. of Bronson, 315 Or. 149, 843 P.2d 890, 896 (1992).
Duty exists as a matter of law and generally can arise from four sources: legislative enactments, judicial interpretations of enactments, judicial precedent, or the general facts of the case. Clay Elec., 873 So.2d at 1185. As this Court explained in McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla.1992), regarding the fourth category, “[t]he duty element of negligence focuses on whether the defendant’s conduct foreseeably created a broader ‘zone of risk’ that poses a general threat of harm to others.” However, a proper application of McCain after American Aviation must include an analysis of how far-reaching the duty stretches because allowing recovery must have a sensible and just stopping point. See Lemke-Wojnicki v. Kolodziaj, 258 Wis.2d 950, 655 N.W.2d 212, 215 (Ct.App.2003); see also Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1060 (2001) (“[I]n determining whether a duty exists, courts must be mindful of the precedential, and consequential, future effects of their rub ings, and limit the legal consequences of wrongs to a controllable degree.” (internal quotation marks omitted)). The injury cannot be too remote from the negligence. See Kolodziaj, 655 N.W.2d at 215; see also Lodge v. Arett Sales Corp., 246 Conn. 563, 717 A.2d 215, 223 (1998) (“In every case in which a defendant’s negligent conduct may be remotely related to a plaintiffs harm, the courts must draw a line, beyond which the law will, not impose legal liability.”).
Courts have generally recognized that foreseeability in the duty context is not unlimited. See, e.g., Scott v. Fla. Dep’t of Transp., 752 So.2d 30, 33 (Fla. 1st DCA 2000) (“It is incumbent upon the courts to place limits on foreseeability, lest all remote possibilities be interpreted as foreseeable in the legal sense.” (quoting Fla. Power & Light Co. v. Macias, 507 So.2d 1113, 1115 (Fla. 3d DCA 1987))); Ransom v. Bethany Acad., No. A07-1769, 2008 WL 3289853 at *2 (Minn.Ct.App. Aug.12, 2008) (“[Ajlthough foreseeability creates a duty of ordinary care, the Minnesota Supreme Court has recognized that there are limits to foreseeability.”); RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 650 A.2d 153, 156 (1994) (“Many harms are quite literally ‘foreseeable,’ yet for pragmatic reasons, no recovery is allowed.”); People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 495 A.2d 107, 116 (1985) (noting that “members of the general public, or invitees such as sales and service persons at a particular plaintiffs business premises, or persons travelling on *1232 a highway near the scene of a negligently-caused accident ... who are delayed in the conduct of their affairs and suffer varied economic losses, are certainly a foreseeable class of plaintiffs” but stating that such a class would not be permitted to recover).
Additionally, it is insufficient to show that a defendant owed a duty to the world at large. See William L. Prosser, Handbook of the Law of Torts, § 36, at 166 (2d ed.1955); Hamilton, 727 N.Y.S.2d 7, 750 N.E.2d at 1060 (“The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her....”). The purpose of the specific duty requirement is to avoid subjecting an actor to limitless liability to an indeterminate number of individuals conceivably injured by any negligence. See Hamilton, 727 N.Y.S.2d 7, 750 N.E.2d at 1060. This Court has stated that the concept of “ ‘[djuty’ is not sacrosanct in itself, but. only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.... ” Gracey v. Eaker, 837 So.2d 348, 354 (Fla.2002) (quoting William L. Prosser, Handbook of the Law of Torts, § 53, at 325-26 (4th ed.1971)).
Duty was appropriately limited in TS & C Investments, LLC v. Beusa Energy, Inc., 637 F.Supp.2d 370 (W.D.La.2009), when local business owners (including truck stops, gas stations, and minimarts) brought a putative class action for economic damages sustained after an oil well blew out, causing closure of an interstate highway. The plaintiffs claimed damages for loss of business and economic opportunity. Beusa, 637 F.Supp.2d at 373. The court concluded that there was no independent duty to protect the claimants’ economic interests. Id. at 381. Were the court to permit recovery, the argument could later be made that anytime the interstate closed due to negligent conduct, all impacted business people could seek economic damages occasioned by the interstate’s closure on the grounds that drivers owed a duty to those businesses located within several miles of the interstate. Id. Even though economic injury to highway business was foreseeable, the court found recovery to be inappropriate under a duty-risk analysis. Id.
Here, the plaintiffs have suffered no personal injury. They have suffered no property damage. The only losses the commercial fishermen allege are economic in nature; and negligence claims for the recovery of economic losses must be predicated on some duty beyond the duty to exercise reasonable care to prevent foreseeable harm. See Am. Aviation, 891 So.2d at 546 (Cantero, J., concurring) (quoting Onita Pac. Corp., 843 P.2d at 896). Defendants must have “an independent duty to protect [a] plaintiffs purely economic interests.” Id. However, Mosaic had no such duty to the plaintiff; and if this Court allows commercial fishermen to recover under the foreseeability analysis in McCain, then liability will be limitless. Such expansive common law liability turns Mosaic and other similarly situated parties into insurers of the economic interests of all parties who can claim monetary loss because of pollution. The unrestricted imposition of liability on polluters for purely economic damages could create future liability “in an indeterminate amount for an indeterminate time to an indeterminate class.” Ultramares Corp. v. Touche, 255 N.Y. 170, 179, 174 N.E. 441 (N.Y.1931); see also City of Chicago v. Beretta U.S.A. Corp., 213 Ill.2d 351, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1140 (2004) (“[T]he economic consequences of any single accident are virtually endless.”). Therefore, denying common law recovery is appropriate.
*1233 Moreover, commercial fishermen in Florida do not have a “special” interest within the “zone of risk” the majority finds Mosaic to have created.[11] Rather, commercial fishermen are few among the tens of thousands of Floridians who earn their living from healthy ocean waters. For example, in 2006, beach tourism alone contributed $24.1 billion to the state’s economy and provided 275,630 Floridians with jobs, earning them $7.7 billion. Center for Urban & Environmental Solutions, Florida Atlantic University, Florida Visitor Study 1 (2008) (prepared for Florida Department of Environmental Protection, Bureau of Beaches and Coastal Systems, DEP Contract No. BS014); see also Forrest J. Bass, Calming the Storm: Public Access to Florida’s Beaches in the Wake of Hurricane-Related Sand Loss, 38 Stetson L.Rev. 541, 570-71 (2009) (“Sales tax revenues, parking fees, fines, and tourism dollars are all generated from recreational public beach access to Florida’s beaches. For example, beach-related tourism directly generated $21.9 billion in 2000. This included $700 million in sales tax revenue and provided 442,000 jobs. Nearly one-third of non-resident tourists visited Florida’s beaches in 2003. Florida ranks behind only California with regard to the size of its tourism revenues. Further, more tourists visit Miami Beach each year than Yellowstone, the Grand Canyon, and Yo-Semite combined.”) (footnotes omitted); Erika Kranz, Sand for the People: The Continuing Controversy Over Public Access to Florida’s Beaches, 83 Fla. B.J., June 2009, at 11 (“Florida is known worldwide for snowy-white beaches that provide peace, quiet, and natural beauty and also anchor the tourism that constitutes an essential part of the state’s economy.”); State v. Osceola County Indus. Dev. Auth., 424 So.2d 739, 740 (Fla.1982) (stating that in 1980 tourism generated expenditures of over $17 billion, employed 580,000 Floridians with a $4 billion payroll, and generated state tax revenues of more than $785 million).
Although the majority rules that the commercial fishermen’s state licenses set them apart from the general population,[12] if every state-licensed Floridian has a “special” or “unique” interest, then it seems there is endless “foreseeable” liability. Commercial fishermen are a small group, among thousands of licensed Floridians, who can claim economic damages from pollution of coastal waters. For example, hotels and restaurants near the beach, seafood truck drivers, beach community realtors, and yacht salesmen áre all licensed by the State to conduct commercial activities that may be negatively affected by pollution of coastal waters. See § 509.241(1), Fla. Stat. (2004) (requiring public lodging and public food service *1234 establishments to obtain licenses from the State); § 322.03(3)(b), Fla. Stat. (2004) (requiring Florida residents to obtain a commercial driver’s license from the State in order to operate a commercial motor vehicle); §§ 475.15-475.161, Fla. Stat. (2004) (requiring real estate brokers and broker associates to obtain licenses from the State); § 326.004(1), Fla. Stat. (2004) (requiring yacht brokers and salesmen to obtain licenses from the State). Because the commercial fishermen have not demonstrated that Mosaic owed a specific, unique duty to protect their purely economic interests, I would disallow common law recovery in order to avoid subjecting defendants to limitless liability to an indeterminate number of individuals conceivably injured by any negligence.
III. CONCLUSION
Although I employ different reasoning, I agree with the majority’s affirmative answer to the certified question on the commercial fishermen’s statutory cause of action. However, unlike the majority, I would answer the certified question on the commercial fishermen’s common law cause of action in the negative. I agree with the Second District that “Mosaic did not owe an independent duty of care to protect the fishermen’s purely economic interests— that is, their expectation of profits from fishing for healthy fish.” Curd, 993 So.2d at 1083.
Accordingly, I respectfully concur in part and dissent in part.

. Petitioner’s Fourth Amended Complaint (emphasis added).

. These sections are currently known as the "Pollutant Discharge Prevention and Control Act.” § 376.011, Fla. Stat. (2004).

. The majority correctly does not address whether Curd chose to file his cause of action under the appropriate section. The issue is not before us. I note that the majority’s statutory ruling pertains to surface and ground water but the common law liability relates to the ocean.

. See Curd, 993 So.2d at 1084 (“[I]f this statute were given the expansive interpretation suggested by the fishermen, it would be very difficult to decide when damages were so remote that they were no longer damages.”)

. See majority op. at 1228 (“[T]he commercial fishermen had a special interest within that zone of risk, an interest not shared by the general community.” (citing Union Oil Co. v. Oppen, 501 F.2d 558, 568 (9th Cir.1974))). Courts, such as the Oppen court, have acknowledged the special interests of commercial fishermen while creating an exception to the economic loss rule, which generally prohibits recovery for economic damages without personal or property damage. See Oppen, 501 F.2d at 563-68. The existence of a general economic loss rule makes it possible for such courts to conclude that polluters have a duty solely to commercial fishermen without creating limitless, incidental liability for others. Because this Court abrogated the general requirement for personal or property damage in American Aviation, this option is no longer available to this Court, and the cases regarding the commercial fishermen exception cited by the majority are inapplicable.

. See majority op. at 1228 ("The fishermen were licensed to conduct commercial activities in the waters of Tampa Bay, and were dependent on those waters to earn their livelihood.”).