NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


MOSAIC FERTILIZER, LLC, )
)
     Appellant, )
)
v. )    Case No. 2D17-2302
)
HOWARD CURD, FLOYD DEFOREST, )
SCOTT MOBLEY, GARY BRUCE, )
DAVID LAGGNER, BRYAN )
IBASFALEAN, PHILIP JOHNSON, and )
ANGELO LOGRANDE, on behalf of )
themselves and all others similarly )
situated, )
)
     Appellees. )
_____ )


Opinion filed November 9, 2018.

Appeal pursuant to Fla. R. App. P. 9.130
from the Circuit Court for Hillsborough
County; Steven Scott Stephens, Judge.

David B. Weinstein and Kimberly Mello of
Greenberg Traurig, P.A., Tampa, and
Andrew J. Patch of Greenberg Traurig,
P.A., Tampa (withdrew after briefing), for
Appellant.

Andra T. Dreyfus and Casey C. Harrison
of Dreyfus Harrison, P.A., Clearwater,
and F. Wallace Pope, Jr., of Johnson,
Pope, Bokor, Ruppel & Burns, LLP,
Clearwater, for Appellees.

NORTHCUTT, Judge.

Mosaic Fertilizer, LLC, appeals a nonfinal order granting plaintiffs' motion for class certification. We reverse because the putative class of plaintiffs failed to demonstrate a reasonable methodology for proving classwide claims.

Howard Curd and other commercial fishermen sued Mosaic following a pollutant spill into Tampa Bay. The fishermen alleged that Mosaic owned or operated a phosphogypsum storage area near Archie Creek in Hillsborough County. Within the storage area was a pond containing the pollutant-rich wastewater from a phosphate plant. Although dikes enclosed the wastewater pond, the fishermen alleged that in the summer of 2004 the Hillsborough County Environmental Protection Commission and the Florida Department of Environmental Protection warned Mosaic that the pond was dangerously close to exceeding safe storage levels. In September 2004 Hurricane Frances swept across Florida, and on September 5, 2004, the dike gave way, spilling wastewater into Tampa Bay. In their lawsuit, the fishermen claimed that "the spilled pollutants resulted in a loss of underwater plant life, fish, bait fish, crabs, and other marine life. [Though the fishermen did not claim ownership of the damaged marine life, they claimed that the spill] resulted in damage to the reputation of the fishery products the fishermen are able to catch and attempt to sell." Curd v. Mosaic Fertilizer, LLC, 993 So. 2d 1078, 1079 (Fla. 2d DCA 2008), decision quashed, 39 So. 3d 1216 (Fla. 2010).

The circuit court allowed the fishermen to proceed on their claim, but ultimately it dismissed the claim as unauthorized by the economic loss rule. See generally Tiara Condo. Ass'n. v. Marsh & McLennan Cos., 110 So. 3d 399, 401-07 (Fla.

- 2 -

2013) (discussing the origin and development of the economic loss rule). This court affirmed and certified questions of great public importance; the Florida Supreme Court quashed this court's opinion and held that the economic loss rule did not bar the fishermen from pursuing both a common law negligence claim as well as a statutory cause of action under section 376.313(3), Florida Statutes (2004). Curd v. Mosaic Fertilizer, LLC, 39 So. 3d 1216 (Fla. 2010) (quashing Curd v. Mosaic Fertilizer, LLC, 993 So. 2d 1078 (Fla. 2d DCA 2008)). The supreme court concluded that section 376.313(3) provides "private causes of action to any person who can demonstrate damages as defined under the statute," id. at 1222, and that "the discharge of the pollutants constituted a tortious invasion that interfered with the special interest of the commercial fishermen to use those public waters to earn their livelihood." Id. at 1228.

On remand, the fishermen filed their fifth amended complaint and made an initial attempt to certify a class of commercial fishermen. However, the fishermen later opted to forgo class certification and instead moved to intervene or join the putative class members and proceed on a nonclass basis. The circuit court denied the motion to intervene. The fishermen appealed, and this court affirmed without opinion. Anderson v. Mosaic Fertilizer, LLC, 160 So. 3d 419 (Fla. 2d DCA 2015) (table decision).

Again before the trial court, the fishermen moved for class certification. They defined the putative class members as:

> Those persons engaged in the commercial catch and sale of fish, bait fish, shrimp, crabs, and other living sea creatures in the Tampa Bay and who have lost income and continue to suffer damages because of the pollution, contamination, and discharge of hazardous substances by the defendant, Mosaic.

The fishermen argued that the putative class met all of the threshold requirements of Florida Rule of Civil Procedure 1.220(a). They also asserted that the putative class met rule 1.220(b)(3)'s predominance requirement because all members are entitled to recover under the exact same legal theories and because the members sustained damages resulting from the same spill. The fishermen concluded that the "overwhelming common legal and factual aspects between the claims of the named Plaintiffs and putative class members dwarf any variation in the claims and predominate over any individualized issues."

Mosaic responded in opposition to class certification. It contended that the fishermen ultimately would be unable to prove any of their claims, and it attached a bevy of environmental impact reports authored by various government agencies as well as private environmental services firms. Mosaic asserted that all of the reports indicate that the pollutant release from the Mosaic facility was "localized, ephemeral, and resulted in no statistically significant difference in the composition of the fish and invertebrate communities" in Tampa Bay. Mosaic attacked the putative class on all grounds of rule 1.220(a) and argued that the fishermen could not demonstrate a classwide impact or a methodology for generalized proof sufficient to support certification.

The circuit court held a hearing on the motion for certification. On the first day of hearings, the fishermen presented the testimony of two plaintiffs, Eugene Nipper and Howard Curd. Nipper testified that he is a commercial fisherman who has dived in the waters of Tampa Bay since the 1970s. He recounted that since he began his career, he regularly walked on the bottom of Tampa Bay using weights and scuba

equipment. Nipper related that he used to see a flourishing seabed where he walked the bottom. But after the spill, he said, he began seeing more dead sea life and noticed that the color of the water changed. Nipper stated that over time, more sponges started to come back after an initial decline following the spill. After a series of objections from Mosaic, the court ruled that Nipper was not qualified to offer opinions about the spill's impact on the condition of the water or on the marine and vegetation life. Nipper's testimony was restricted to his personal observations and recollections of after-spill changes to Tampa Bay.

Curd, a commercial fisherman in Tampa Bay for thirty years who fished primarily for blue crab, testified that in the days following the spill, his traps were filled with dead blue crab. He also stated that the year after the spill, the blue crab did not come as far into the bay as they once had. He said that every year after the spill the crab would stay farther and farther out to sea. Curd testified that several years after the spill, he was unable to catch any blue crab for two years in a row. Mosaic objected to Curd's testimony, and the court prohibited him from offering an opinion or belief about whether the spill caused a decrease in his fishing yields or whether the spill had an effect on other Tampa Bay fishermen's yields.

After the first day of hearings, the circuit court entered an order requiring further proceedings for class certification determinations. In the order, the court noted that time expired at the hearing before Mosaic presented its evidence and ordered the resumption of the hearing. It noted that after the first day of hearings, the "plaintiffs have placed in the record sufficient showing that could support the court in its discretion certifying class." The court further observed that the "common claims predominate

- 5 -

because if the named plaintiffs can prove their damages . . . they would be proving impact quite remote from the spill site and thus necessarily prove the case of the other class members."  The court sua sponte amended the proposed class definition to include "holders of commercial fishing licenses who claim to have been damaged by the spill."

On the second day of hearings, Mosaic tendered the testimony of seven expert witnesses without objection.  The experts gave unrebutted opinions that supported Mosaic's argument that the spill only caused localized, ephemeral, and statistically insignificant changes in sea-life communities.  More specifically, the experts opined that the contents of the spill were so quickly diluted and dispersed that there was no scientifically valid means of predicting or even inferring the spread or presence of any pollutant outside of the immediate impact area.  After Hurricane Frances, the experts opined, Tampa Bay became so inundated with pollutants and debris from storm water runoff that there was no reliable method of distinguishing Mosaic's pollutants from the river and creek sediments, petroleum products, household chemicals, and untreated sewages that were flushed into the bay.  Mosaic's experts concluded that there were no long-term or population-level effects on any species of marine organism and that the only effects on marine life were isolated to the immediate area of the spill.  Mosaic also presented an expert on commercial fishing economics who opined that the various fishing areas covered by the putative class are so diverse in targeted species, contain such diverse biology and life history of those species, as well as changes in those species' characteristics over time, that it would be impossible to correlate or make predictions about those fishing areas.

After the two days of hearings, the circuit court entered an order bifurcating the case into liability and damages phases and cited to Engle v. Liggett Group, Inc., 945 So. 2d 1246 (Fla. 2006). The court defined the liability phase as extending "up to and including determination of the geographic scope of potentially harmful effects of the spill." The order suggested that after all liability issues were resolved the court would consider decertification for the determination of individual damages. The court also granted the fishermen's motion for class certification only as to the liability phase. It found that the fishermen had met their burden under rule 1.220(a) and that the liability issues—as the court defined them—are common questions which predominate the individual damages issues. Mosaic appealed the order bifurcating the case and certifying the class; we have jurisdiction. See Fla. R. App. P. 9.030(b)(1)(B); 9.130(a)(3)(C)(vi).

We review orders granting class certification for an abuse of discretion. Sosa v. Safeway Premium Fin. Co., 73 So. 3d 91, 103 (Fla. 2011). " '[T]he determination that a case meets the requirements of a class action is a factual finding,' which falls within a circuit court's discretion." Id. (quoting Bouchard Transp. Co. v. Updegraff, 807 So. 2d 768, 771 (Fla. 2d DCA 2002)). The circuit court abuses its discretion where its order is not supported by competent, substantial evidence or if it makes an erroneous conclusion of law. Id. at 103.

To obtain class certification, the proponent carries the burden of proving the elements required under rule 1.220. See id. at 106; Ernie Haire Ford, Inc. v. Gilley, 903 So. 2d 956, 958 (Fla. 2d DCA 2005); Marco Island Civic Ass'n v. Mazzini, 805 So.

2d 928, 930 (Fla. 2d DCA 2001). Rule 1.220(a) contains four threshold elements that must be satisfied to obtain class certification:

> (1) the members of the class are so numerous that separate joinder of each member is impracticable ["numerosity"], (2) the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class ["commonality"], (3) the claim or defense of the representative party is typical of the claim or defense of each member of the class ["typicality"], and (4) the representative party can fairly and adequately protect and represent the interests of each member of the class ["adequacy"].

Additionally, the proponent of class certification must satisfy one of the three subdivisions of rule 1.220(b). The fishermen alleged and the circuit court found that the putative class satisfied subdivision 1.220(b)(3), which requires that

> the questions of law or fact common to the claim or defense of the representative party and the claim or defense of each member of the class predominate over any question of law or fact affecting only individual members of the class, ["predominance"] and class representation is superior to other available methods for the fair and efficient adjudication of the controversy ["superiority"].

Rule 1.220(b)(3)'s superiority requirement requires the court to weigh the benefits of class certification versus proceeding on an individual, nonclass basis. See Sosa, 73 So. 3d at 116 (instructing that courts should consider three factors: whether a class action would provide the only economically viable remedy to class members, the likelihood of individual claims large enough to justify the expense of individual litigation, and whether a class action cause of action is manageable). Rule 1.220(b)(3)'s predominance requirement, however, calls upon the court to make a "proof-based inquiry." Id. at 112. A proponent of certification must demonstrate a "reasonable methodology for generalized proof of class-wide impact" whereby "proving his or her

- 8 -

own individual case, [the putative class representative] necessarily proves the cases of the other class members." Id.

In this case, the fishermen failed to carry their burden of positing any reasonable methodology for proving classwide claims. The circuit court sua sponte amended the putative class to include any holders of commercial fishing licenses who claim to have been damaged by the Mosaic spill. The fishermen therefore had the burden of proving—beyond mere "supposition"—some methodology for generalized proof by which the class representative would necessarily prove the cases of all other commercial fishing license holders who claim to have been damaged by the spill. Ernie Haire Ford, 903 So. 2d at 958.

The fishermen's support for class certification amounted only to the testimony of Curd and Nipper. Both men testified that they were commercial fishermen who worked in the Tampa Bay waters for over thirty years. Both men testified that they witnessed changes in certain marine life concomitant with the Mosaic spill. The circuit court restricted both men's opinion testimony and ruled that they were not qualified to offer any opinions about the spill's impact on the condition of the water, the spill's impact on the marine and vegetation life, or whether the spill caused any decrease in the Tampa Bay fishing yields. Taken as a whole, it is not possible to view Curd's and Nippers' testimony as plausibly putting forth a reasonable methodology for proving classwide claims. The circuit court therefore abused its discretion because there was no competent, substantial evidence supporting its "proof-based inquiry" into and ultimate determination of rule 1.220(b)(3)'s predominance requirement. Sosa, 73 So. 3d at 112.

Although the circuit court bifurcated the case into a liability and damages phases in the vein of Engle, this bifurcation does not change our decision. First, it is not necessarily clear that Engle prospectively authorized bifurcation as a means of meeting rule 1.220(b)(3)'s requirements. See Engle, 945 So. 2d at 1267-71; see also Fla. R. Civ. P. 1.220(d)(4)(A) ("When appropriate . . . a claim or defense may be brought or maintained on behalf of a class concerning particular issues."). The Engle court cited numerous federal cases which certified liability questions and which left damages questions for individual resolution. Engle, 945 So. 2d at 1268-69. Engle also noted a split of that federal authority on the issue. Id. at 1269 n.11. Ultimately, the Engle court approved the certification of certain liability issues holding that rule 1.220(b)(3)'s predominance test was satisfied on the facts presented. However, the Engle court also underscored the idiosyncratic nature of that case noting that the procedural posture was "unique and unlikely to be repeated," id. at 1270 n.12, and describing its holding as the "pragmatic solution" to those unique circumstances. Id. at 1270.

Even assuming that Engle authorized the circuit court to use rule 1.220(d)(4)(A) to certify classwide liability issues, the fishermen did not present a reasonable methodology for proving those issues classwide. Again, the court's order certifying class defined the liability phase as containing all issues up to and including determination of the geographic scope of potentially harmful effects of the spill. Yet the court's order acknowledges that the "plaintiffs' yet-to-be-revealed evidence of the effect of the spill" is a question to be resolved at the liability stage. Without making some antecedent showing of the methodology by which the fishermen intended to prove classwide claims, the fishermen failed to meet the burden imposed by rule 1.220(b)(3).

Accordingly, we reverse the order on appeal and remand for further proceedings consistent with this opinion.

Reversed and remanded.

KELLY and SALARIO, JJ., Concur.