**STATE OF LOUISIANA, ex rel. William J. GUSTE, Jr., Attorney General,**

v.

**The M/V TESTBANK, etc., and the M/V SEA DANIEL, etc., et al.**

Civ. A. No. 80–2738.*

United States District Court,
E. D. Louisiana.

Oct. 28, 1981.

---

* Combined for pretrial administrative purposes with: 80–2758, 80–2807, 80–2808, 80–2816, 80–2828, 80–2852, 80–2867, 80–2874, 80–2883, 80–2888, 80–2894, 80–2902, 80–2970, 80–2973, 80–2974, 80–2976, 80–2977, 80–2986, 80–3046, 80–3057, 80–3079, 80–3120, 80–3286, 80–3678, 80–3853, 80–3987, 80–4006, 80–4007, 80–4010, 80–4592, 80–4616, 80–4708, 80–4861, 81–0207, 81–1114, 81–2693, 81–2937, 81–2949, 81–2961, 81–2962 and 81–2963.

C. A. Helms, T. J. Grace, C. J. Pisano, W. J. Leger, Jr., New Orleans, La., for plaintiffs.

J. D. LeBlanc, Jr., W. Carroll, Jr., New Orleans, La., for defendants.

BEER, District Judge.

Plaintiffs seek to recover damages allegedly incurred as a result of the July 22, 1980 collision between the M/V TESTBANK and the M/V SEA DANIEL. The collision occurred near Mile 41 of the Mississippi River Gulf Outlet. Containers being transported aboard the TESTBANK were lost overboard. One was packed with approximately 12 tons of pentaclorophenol (PCP) in 50 pound bags.[1]

Because of the highly toxic nature of this chemical, the United States Coast Guard, acting pursuant to their authority as the responsible governmental agency, closed the Mississippi River Gulf Outlet to vessel navigation until August 10, 1980. Additionally, because of the possibility that aquatic life was contaminated by the PCP, the Coast Guard temporarily closed a substantial number of square miles of Louisiana waterways and marshes to commercial fishermen, crabbers, oystermen and shrimpers. The area that was closed to commercial fishing[1a] extended north to the southern portion of Lake Borgne where it comes together with the Intracoastal Waterway; east from the southeastern shore of Lake Borgne beginning at Point aux Marchettes to Bayou St. Mato continuing along toward Bayou La Loutre including portions of Eloi Bay and Lake Eloi; south to Bayou Terre aux Beoufs encompassing Lake Athanasio, Lake Fortuna, Lake Machias, Lake Calabasse and reaching southernmost to Mozam-bique Point; west along Bayou Terre aux Beoufs including Delacroix Island and continuing northward where it joins with the Mississippi River Gulf Outlet Canal and finally back to the Intracoastal Waterway.

Plaintiffs assert various theories of liability including maritime tort, private causes of action pursuant to the River & Harbor Act, 33 U.S.C. §§ 401, 407, the laws of the State of Louisiana and the laws of the United States. Plaintiffs' basic contention as to jurisdiction is that the collision and alleged contamination constitute a maritime tort and, thus, is within the maritime and admiralty jurisdiction of the court. 28 U.S.C. § 1333. *Burgess v. M/V TAMANO*, 370 F.Supp. 247 (S.D.Me.1973), aff'd per curiam, 559 F.2d 1200 (1st Cir. 1977).

Defendants now seek summary judgment as to all claims for alleged economic loss, contending that the damages for which plaintiffs seek recovery are consequential results of the TESTBANK–SEA DANIEL collision in which no actual physical damage occurred. Thus, defendants argue that plaintiffs may not recover for losses sustained solely from the negligent interference with contractual relations or mere business expectations.

In order for plaintiffs to withstand this direct attack, they must distinguish an abundance of jurisprudence in which other courts have denied recovery for indirect economic loss. *Robins Dry Dock and Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). *Robins* has provided the foundation on which the federal courts have based subsequent opinions denying recovery for similar claims. Most notably, in *Dick Meyers Towing Service, Inc. v. U. S.*, 577 F.2d 1023 (5th Cir. 1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979), a tug boat operator sought damages for negligent interference with business expectations when commerce was halted for several months after a canal lock failed. In denying recovery, the court determined that "... merely negligent interference

---

1. Additionally, several drums of hydrobromic acid and ethyl mercaptan were either ruptured or lost overboard.

1a. including oystering, crabbing and shrimping.

with contract rights is not actionable." *Id.* at 1024.

More recently, the U. S. Fifth Circuit Court of Appeals, although permitting the owner of an unloading facility to recover damages resulting from a collision with a vessel, again reaffirmed the continued vitality of the principles first espoused in *Robins*, stating:

"...The critical factor in the application of the *Robins* holding in each of these cases was the *character of the interest harmed*. We have been, in such instances, reluctant to recognize claims based solely on harm to the interest in contractual relations or business expectancy." *Vicksburg Towing v. Mississippi Marine Transport*, 609 F.2d 176, 177 (5th Cir. 1980). (Emphasis supplied.)

Since *Robins*, this circuit has been steadfast in its denial of recovery when claimants have lacked a proprietary interest in property suffering physical damage. *See, e. g., Louisville and Nashville R.R. Co. v. M/V BAYOU LACOMBE*, 597 F.2d 469 (5th Cir. 1979); *Kaiser Aluminum and Chemical Corp. v. Marshland Dredging Co.*, 455 F.2d 957 (5th Cir. 1972). The Fifth Circuit has not stood alone in its adherence to *Robins*. *In Re Marine Navigational Sulphur Carriers v. Lone Star Industries, Inc.*, 638 F.2d 700 (4th Cir. 1981), denied for recovery claims of indirect economic loss[2] arising from the collision of a vessel with a bridge resulting in the subsequent closure of the bridge and delay of river traffic. There, none of the claimants demonstrated any physical damage to their property and person, and the court concluded that such economic and non-physical losses as were claimed were too remote to be compensable. *Id.* at 702. *See, also, Petition of Kinsman Transit Co.*, 388 F.2d 821 (2nd Cir. 1968).

In the present case, plaintiffs seek to navigate around *Robins* and its progeny by way of various cases which have permitted recovery of economic losses based on the character of the interest harmed. Plaintiffs maintain that *J. Ray McDermott & Co. v. The S/S EGERO*, 453 F.2d 1202 (5th Cir. 1972), established an exception to *Robins* by permitting the "owner" of a pipeline project to recover delay related expenses incurred after an anchor was dropped "on or near" the pipeline under construction.[3] Recovery was allowed despite the fact that there was no physical damage to the pipeline. In so holding, the court noted:

"*Robins* does not stand for the proposition that no one may recover damages suffered or liabilities incurred by virtue of a contract when a ship is tortiously detained. Certainly the shipowner may recover all damages proximately caused by another's tortious conduct with respect to his ship." *Id.* at 1204. (Citations omitted.)

However compelling the reasoning upon which the *EGERO* opinion is premised, it is distinguished from the instant case on its facts. In *EGERO*, the contractor was forced to halt construction in order to ensure that there was no property damage to the pipelines. Here, the "character of the interest harmed" differs substantially from that before the *EGERO* court.

Similarly, *China Union Lines, Ltd., as Owners of the S/S UNION RELIANCE*, 285 F.Supp. 426 (S.D.Tex., 1967), and *The Matter of the Complaint of Lyra Shipping Co.*, 360 F.Supp. 1188 (E.D.La., 1973), are not persuasive. In *China Union*, several vessels sought delay related expenses when they were unable to traverse a blocked channel following the negligent collision of two vessels. Similarly, in *Lyra*, a vessel collided with the Industrial Canal Locks,

---

2. The claims dismissed by the court included those for business interruption, loss of trade, and added expense. Additionally, one claimant sought recovery because it was unable to traverse the river thereby preventing it from delivering material from its quarrys to its plants. 638 F.2d at 702.

3. The *EGERO* defendants relied on *Robins* arguing that the damages arose from an unintentional interference with contractual relations between the contractor and his subcontractor and, alternatively, that the damages were not proximately caused by the defendant's negligence and were therefore too remote and unforeseeable. *Id.* at 1203.

resulting in a temporary closure of the canal. Although the district judge there denied defendant's motion for summary judgment relating to claims for delay related expenses, later courts have rejected the theories of recovery advanced by the *Lyra* and *China Union* courts. For example, in *Complaint of Bethlehem Steel Corp.*, 449 F.Supp. 681 (N.D.Ohio, 1977), after acknowledging the existence of the *China Union* and *Lyra* holdings, the court maintained that "... it nonetheless remains cognizant of the decision in *Petition of Kinsman Transit Company*, 388 F.2d 821 (2nd Cir., 1968), which along with *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), has become textbook tort law with respect to the doctrines of foreseeability and remoteness of damage." *Id.* at 688.

■ Nevertheless, claims for economic loss asserted by the commercial oystermen, shrimpers, crabbers and fishermen raise unique considerations requiring separate attention. Traditionally, seamen have been recognized as favored in admiralty and their economic interests require the fullest possible legal protection. *The DEL RIO*, 209 F.2d 178, 182 (9th Cir. 1953). Accordingly, in those instances where there has been a tortious invasion of commercial fishing areas by the introduction of pollutants or contaminants, courts have affirmatively protected those fishermen who incurred actual economic losses. *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974); *Burgess v. M/V TAMANO*, 370 F.Supp. 247 (S.D.Me. 1973), *aff'd per curiam*, 559 F.2d 1200 (1st Cir. 1977); *Masonite Corp. v. Steede*, 198 Miss. 530, 23 So.2d 756 (Miss.1945); *Hampton v. North Carolina Pulp Co.*, 223 N.C. 535, 27 S.E.2d 538 (1943).

In *TAMANO, supra*, the court recognized that although fishermen and clammers have no individual property rights with respect to the aquatic life harmed by oil pollution, they could sue for the tortious invasion of a public right, having suffered damages greater in degree than the general public. *Id.* at 250. Thus, when an oil spill prohibited fishermen from plying their trade, the court considered it an interference with the "direct exercise of the public right to fish and dig clams" which was, in fact, a special interest different from that of the general public. Thus, in those instances where plaintiff fishermen have established a course of business conduct which makes *commercial use* of a public right with which the defendant interferes, pecuniary losses may be recoverable.

The *Oppen* court, *supra*, reached a similar result emphasizing that offshore oil producers are under a duty to commercial fishermen to conduct their operations in a reasonably prudent manner so as to avoid any diminution in marine life.[4] 501 F.2d at 570. The economic losses which were protected by *Oppen* were limited to those commercial fishermen who could demonstrate that the oil spill reduced income from those amounts which had been previously realized. *Id.*

As in *TAMANO*, the plaintiff fishermen in this case can claim no proprietary interest in marine life until it is harvested. *LeBauve v. Louisiana Wildlife & Fisheries Commission*, 444 F.Supp. 1370 (E.D.La. 1978). In fact, the Louisiana Civil Code vests the state with ownership of "public things" including "... running waters, the waters and bottoms of natural navigable water bodies...." LSA–C.C. art. 450; *see also* LSA–R.S. 9:1101. However, similar obstacles were before the *Oppen* and *TAMANO* courts, both of which determined that the special interests of commercial fishermen must be protected even in the absence of any proprietary rights over aquatic life. Thus, the *TAMANO* opinion is persuasive with respect to those fishermen who routinely operated in the Mississippi River Gulf Outlet and the surrounding areas temporarily closed by the Coast Guard.

**4.** The court emphasized that its decision to allow commercial fishermen to recover did not open the door to claims by others whose economic or personal affairs were discommoded by the oil spill. 501 F.2d at 570. Similarly, the *TAMANO* court dismissed the claims of local businessmen who did not assert any interference with "their direct exercise of a public right." *TAMANO, supra*, at 251. These results are consistent with the first portion of this opinion regarding the claims asserted by the nonfishermen plaintiffs.

They were exercising their public right to make a *commercial use* of those waters. The collision between the TESTBANK and the SEA DANIEL and the resulting discharge of the PCP constituted a tortious invasion that interfered with the special interest of the commercial fishermen, crabbers, shrimpers and oystermen to use those public waters to earn their livelihood and the specific pecuniary losses which can be shown to have been incurred should be recoverable.

Because unresolved factual issues exist pertaining to the exact geographic delineation of the Coast Guard mandated closure, I realize that some plaintiffs or, more correctly, potential plaintiffs will have claims that will depend on the ultimate resolution of those boundaries. Accordingly, IT IS ORDERED that the motion for summary judgment be granted against all plaintiffs who were not commercial fishermen, oystermen, crabbers and shrimpers routinely operating, at times pertinent, in waterways specifically encompassed and defined by the orders of the Coast Guard. As to those claims, and those claims only, the motions are denied. In this connection, I deem it necessary to note that the claims of those commercial fishermen, crabbers, oystermen and shrimpers allegedly affected in areas *other* than those specifically closed by the Coast Guard are, accordingly, dismissed upon a factual showing that such is, indeed, the case. Additionally, for such clarification as may be necessary, the claims of persons or business entities falling into the following categories are also dismissed:

1. Shipping and/or other shipping type interests unable to traverse the area. This includes claims with respect to vessels actually in the area at the time or rerouted around the area at the time.
2. Marina and boat rental operators.
3. Wholesale and retail seafood enterprises not actually engaged in fishing, shrimping, crabbing or oystering in the mandated area.
4. Seafood restaurants.
5. Tackle and bait shops.
6. Fishermen, oystermen, shrimpers and crabbers who engaged in these activities for recreational purposes only.

Counsel for defendants are instructed to prepare a judgment that is consistent with this minute entry. Submit copies to all opposing counsel and notice a hearing to show cause why same should not, as of a date set therein, be signed.