QUINCE, C.J.
This cause is before the Court for review of the decision of the Second District Court of Appeal in Curd v. Mosaic Fertilizer, LLC, 993 So.2d 1078 (Fla. 2d DCA 2008). In its decision the district court ruled upon the following questions, which the court certified to be of great public importance:
DOES FLORIDA RECOGNIZE A COMMON LAW THEORY UNDER WHICH COMMERCIAL FISHERMEN CAN RECOVER FOR ECONOMIC LOSSES PROXIMATELY CAUSED BY THE NEGLIGENT RELEASE OF POLLUTANTS DESPITE THE FACT THAT THE FISHERMEN DO NOT OWN ANY PROPERTY DAMAGED BY THE POLLUTION? DOES THE PRIVATE CAUSE OF ACTION RECOGNIZED IN SECTION 376.813, FLORIDA STATUTES (2004), PERMIT COMMERCIAL FISHERMEN TO RECOVER DAMAGES FOR THEIR LOSS OF INCOME DESPITE THE FACT THAT THE FISHERMEN DO NOT OWN ANY PROPERTY DAMAGED BY THE POLLUTION?
Id. at 1079. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons explained below, we answer the questions in the affirmative and quash the decision below.
FACTS AND PROCEDURAL HISTORY
In Curd, 993 So.2d 1078, the Second District Court of Appeal summarized the facts as follows:
According to the allegations in [Howard Curd and several other commercial fishermen’s (the fishermen) ] complaint, [Mosaic Fertilizer, LLC (Mosaic) ] owned or controlled a phosphogypsum storage area near Archie Creek in Hills-borough County. The storage area included a pond enclosed by dikes, containing wastewater from a phosphate plant. This wastewater allegedly contained pollutants and hazardous contaminants.
The fishermen alleged that in the summer of 2004, the Hillsborough County Environmental Protection Commission and the Florida Department of Environmental Protection both warned Mosaic that the quantity of wastewater in the storage facility was dangerously close to exceeding the safe storage level. According to the complaint, on August 10, 2004, the Department of Environmental Protection warned Mosaic that a 100-foot section of the pond dike was three feet narrower than the minimum required width of 18 feet. It warned that only an inch or two of additional rain during the tropical season would raise the level of pollutants in the pond to the top of the dike. On September 5, 2004, the dike gave way and pollutants were spilled into Tampa Bay.
The fishermen claim that the spilled pollutants resulted in a loss of underwater plant life, fish, bait fish, crabs, and other marine life. They do not claim an ownership in the damaged marine and *1219 plant life, but claim that it resulted in damage to the reputation of the fishery products the fishermen are able to catch and attempt to sell. At least implicitly, they are alleging monetary damages in the nature of lost income or profits.
The complaint included three counts. Count 1 attempted to allege a claim for statutory liability under section 376.313(3), Florida Statutes (2004). Count 2 alleged common law strict liability based upon damages resulting from Mosaic’s use of its property for an ultra-hazardous activity. See, e.g., Cities Serv. Co. v. State, 312 So.2d 799 (Fla. 2d DCA 1975). Count 3 alleged a claim of simple negligence. The trial court concluded that the language in chapter 376 did not permit a claim by these fishermen for monetary losses when they did not own any real or personal property damaged by the pollution. After initially permitting the fishermen to proceed on their claims of negligence and strict liability, the trial court ultimately ruled that these claims were not authorized under the economic loss rule. The fishermen then appealed the dismissal of their entire fourth amended complaint to [the Second District],
Curd, 993 So.2d at 1079-80.
On appeal, the Second District affirmed the trial court’s order dismissing Curd’s proposed class action lawsuit against Mosaic Fertilizer. See Curd, 993 So.2d at 1079. The court held that under traditional principles of negligence the fishermen failed to state a cause of action. See id. at 1083. The court reasoned that an action in common law either through strict liability or negligence was not permitted because the fishermen did not sustain bodily injury or property damage. The strict liability and negligence claims sought purely economic damages unrelated to any damage to the fishermen’s property. Accordingly, the court further reasoned that Mosaic did not owe the fishermen an independent duty of care to protect their purely economic interests. See id. at 1082-83. Additionally, in evaluating the fishermen’s statutory liability claim under section 376.313(3), the court concluded that there is no Florida precedent that permits a recovery for damages under section 376.313(3) when the party seeking the damages does not own or have a possesso-ry interest in the property damaged by the pollution. See id. at 1084. Further, the court said that there is no express language from the Legislature stating that it intended the statute to create a wide array of claims- by people indirectly affected by pollution. See id. The court also declined to read into the statute a legislative intent in section 376.313(3) to allow such economic claims based on the fishermen’s unique relationship with the fish or based on the fact that the fishermen hold commercial fishing licenses. Moreover, the court declined to recognize such a right as a matter of tort law. See id. at 1085. The court was unconvinced that a special theory should be established under the common law for a narrow subset of the people who are indirectly or remotely injured by pollution. See id. at 1085-86.
Pursuant to article V, section 3, subsection (b)(4) of the Florida Constitution and Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v), the Second District certified the questions above to be of great public importance. See Curd, 993 So.2d at 1079. We granted review to answer the certified questions.
ANALYSIS

Statutory Cause of Action

We first address whether the private cause of action recognized in section *1220 376.313(3), Florida Statutes (2004),[1] allows commercial fishermen to recover damages for their loss of income despite the fact that the fishermen do not own any property damaged by the pollution. Our interpretation of a statute is a purely legal matter and therefore subject to the de novo standard of review. See Kephart v. Hadi, 932 So.2d 1086, 1089 (Fla.2006); see also B.Y. v. Dep’t of Children & Families, 887 So.2d 1253, 1255 (Fla.2004) (noting that the standard of appellate review on issues involving the interpretation of statutes is de novo).
When construing a statute, we strive to effectuate the Legislature’s intent. See, e.g., Borden v. East-European Ins. Co., 921 So.2d 587, 595 (Fla.2006) (“We endeavor to construe statutes to effectuate the intent of the Legislature.”); State v. J.M., 824 So.2d 105, 109 (Fla.2002) (noting that legislative intent is the polestar that guides a court’s statutory construction analysis). To determine that intent, we look first to the statute’s plain language. See Borden, 921 So.2d at 595. We have held that “when the statute is clear and unambiguous, courts will not look behind the statute’s plain language for legislative intent or resort to rules of statutory construction to ascertain intent.” Id. (quoting Daniels v. Fla. Dep’t of Health, 898 So.2d 61, 64 (Fla.2005)). In reaching our conclusion that chapter 376, Florida Statutes (2004), allows a cause of action by these plaintiffs, we have construed several provisions of the chapter in pari materia and given effect to the various sections. See E.A.R. v. State, 4 So.3d 614, 629 (Fla.2009); McDonald v. State, 957 So.2d 605, 610 (Fla.2007); Zold v. Zold, 911 So.2d 1222, 1229-30 (Fla.2005).
Section 376.313(3), Florida Statutes (2004), provides as follows:
Except as provided in s. 376.3078(3) and (11), nothing contained in ss. 376.30-376.319 prohibits any person from bringing a cause of action in a court of competent jurisdiction for all damages resulting from a discharge or other condition of pollution covered by ss. 376.30-376.319. Nothing in this chapter shall prohibit or diminish a party’s right to contribution from other parties jointly or severally liable for a prohibited discharge of pollutants or hazardous substances or other pollution conditions. Except as otherwise provided in subsection (4) or subsection (5), in any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred. The only defenses to such cause of action shall be those specified in s. 376.308.
(Emphasis added.) The Second District Court of Appeal provided the following legislative history regarding section 376.313(3):
Chapter 376 regulates the discharge of pollution. The first portion of this chapter was enacted in 1970 as the “Oil Spill Prevention and Pollution Control Act.” See ch. 70-244, Laws of Fla. The legislature expanded the reach of chapter 376 when it enacted the Water Quality Assurance Act of 1983, ch. 83-310, Laws of Fla. Section 84 of chapter 83-310 effectively created a private cause of action for damages caused by pollution. Ch. 83-310, § 84, at 1885, Laws of Fla. *1221 This provision is currently codified in section 376.813(3).
Curd, 993 So.2d at 1083.
The statute at issue is found within chapter 376, which is entitled “Pollutant Discharge Prevention and Removal.” Section 376.315 of this chapter provides that “[sjections 376.30-376.319, being necessary for the general welfare and the public health and safety of the state and its inhabitants, shall be liberally construed to effect the purposes set forth under ss. 376.30-376.319 and the Federal Water Pollution Control Act, as amended.” Additionally, section 376.30, which gives legislative intent regarding pollution of surface and ground waters, provides in pertinent part that the preservation of surface and ground waters “can only be served éffec-tively by maintaining the quality of state waters in as close to a pristine condition as possible, taking into account multiple-use accommodations necessary to provide the broadest possible promotion of public and private interests.” § 376.30(l)(c), Fla. Stat. (2004) (emphasis added). Section 376.30 further provides that the Legislature found and declared that escapes of pollutants “pose threats of great danger and damage ... to citizens of the state, and to other interests deriving livelihood from the state.” § 376.30(2)(b), Fla. Stat. (2004) (emphasis added).
We find that section 376.313(3) and the language used in section 376.30 are clear and unambiguous, and we rely solely on their plain language to discover the legislative intent. Section 376.313(3) provides that “nothing ... prohibits any person from bringing a cause of action ... for all damages resulting from a discharge or other condition of pollution.” § 376.313(3).[2] The language of the statute allows any person to recover for damages suffered as a result of pollution.[3] “Damage,” as used in chapter 376, is defined as “the documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to s. 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant.” See § 376.031(5). Moreover, the Legislature intended that the statute be liberally construed. See § 376.315 (“Sections 376.30-376.319 ... shall be liberally construed to effect the purposes set forth under ss. 376.30-376.319 and the Federal Water Pollution Control Act, as amended.”). The title of section 376.313, “Nonexclusiveness of remedies and individual cause of action for damages under ss. 376.30-376.319,” implies that a liberal construction should be applied under these circumstances. See State v. Webb, 398 So.2d 820, 824-25 (Fla.1981) (holding that when determining legislative intent, due weight and effect must be given to the title of the section because “the title is more than an index to what the section is about or has reference to; it is a direct statement'by the legislature of its intent”).
Importantly, in Aramark, 894 So.2d at 24, we held that section 376.313(3) creates a private cause of action by creating a damages remedy for the non negligent discharge of pollution without proof that the *1222 defendant caused it. Therefore, a defendant can be held liable even without proof that it caused the pollutive discharge, that is, the plaintiff does not have to plead or prove negligence in any form. See id. at 23-24. We noted that the following factors demonstrate that section 376.313(3) creates a cause of action for strict liability regardless of causation:
[T]he statute’s provision of a damages remedy for the non negligent discharge of pollution; the defenses provided in the statute, including the inclusion of lack of causation as an affirmative defense; and other aspects of the statute such as its title, the cumulative remedies clause and the attorney’s fees provision — -when combined with the statutory directive that section 376.313(3) should be liberally construed....
Id. at 26 (citing Gary K. Hunter, Statutory Strict Liability for Environmental Contamination: A Private Cause of Action to Remedy Pollution or Mere Legislative Jargon?, Fla. Bar J., Jan. 1998, at 50, 51). We find that some of those factors are relevant in this case and would allow commercial fishermen to recover damages for their loss of income despite the fact that the fishermen do not own any real or personal property damaged by the pollution. Section 376.313(3) provides that “in any such suit ... [a] person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.” Mosaic contends that despite this language the fishermen are not entitled to economic damages because they do not own any property damaged by the pollution. First, it must be noted that under the definition of damages cited above, one can recover for damages to real or personal property but one can also recover for damages to “natural resources, including all living things.” Furthermore, section 376.313(3) states that “[t]he only defenses to such cause of action shall be those specified in s. 376.308.” Those defenses specified in section 376.308 include acts of war, acts by a governmental entity, acts of God, and acts or omissions by a third party. Because the statute does not specifically list the lack of property ownership as a defense, we find that defense, much as we found the omission of causation in Aramark, was . deliberately omitted.
In sum, the Legislature has enacted a far-reaching statutory scheme aimed at remedying, preventing, and removing the discharge of pollutants from Florida’s waters and lands. To effectuate these purposes, the Legislature has provided for private causes of action to any person who can demonstrate damages as defined under the statute. There is nothing in these statutory provisions that would prevent commercial fishermen from bringing an action pursuant to chapter 376.

The Economic Loss Riile

The Second issue before this Court is whether Florida recognizes a common law theory under which commercial fishermen can recover for economic losses proximately caused by the negligent release of pollutants despite the fact that the fishermen do not own any real or personal property damaged by the pollution. Because this case is before the Court on the trial court’s dismissal of Curd’s fourth amended complaint, we must take all the factual allegations in his complaint as true and construe all reasonable inferences from those facts in his favor. See Florida Dept. of Health & Rehabilitative Servs. v. S.A.P., 835 So.2d 1091, 1094 (Fla.2002) (citing Ralph v. City of Daytona Beach, 471 So.2d 1, 2 (Fla.1983)). Our standard of review is de novo. See id. (citing Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co., 752 So.2d 582, 583 (Fla.2000)).
*1223 The Second District held that the fishermen’s common law negligence and strict liability claims were barred by the economic loss rule and general tort law principles because the fishermen did not own any property damaged by the pollution. See Curd, 998 So.2d at 1080-81. The district court found that Mosaic did not owe the fishermen an independent duty of care to protect their purely economic interests. See id. at 1082-83. Relying on a negligence principle that the law generally protects interests in the safety of person' and property, the district court concluded that the fishermen failed to state a cause of action for strict liability or negligence because they had sustained no bodily injury or property damage. See id. at 1082. Since the fishermen did not own a property interest in the fish or allege any bodily injury, the district court concluded that the fishermen’s negligence and strict liability claims sought purely economic damages unrelated to any damage to the fishermen’s property. Therefore, Mosaic did not owe an independent duty of care to protect the fishérmen’s expectation of profits. See id. at 1083.
The Second District, in finding that the economic loss rule applied to the facts of this case, attempted to explain this Court’s opinion in Indemnity Ins. Co. v. American Aviation, Inc., 891 So.2d 532 (Fla.2004). In American Aviation we undertook a comprehensive look at the economic loss rule including its origin and scope. We clearly stated that the economic loss rule in Florida is applicable in only two situations: (1) where the parties are in contractual privity and one party seeks to recover damages in tort for matters arising out of the contract, or (2) where the defendant is a manufacturer or distributor of a defective product which damages itself but does not cause personal injury or damage to any other property. 891 So.2d at 536.[4]
Clearly neither the contractual nor products liability economic loss rule is applicable to this situation. The parties to this action are not in contractual privity. Moreover, the defendant in this case is not a manufacturer or distributor of a defective product that has caused damage to itself. Rather we have plaintiffs who have brought traditional negligence and strict liability claims against a defendant who has polluted Tampa Bay and allegedly caused them injury. Thus, the economic loss rule does not prevent the plaintiffs from bringing this cause. The plaintiffs’ causes of action are controlled by traditional negligence law, which requires proof of duty, breach, and proximate cause, and by strict liability principles.

Common Law Causes of Action

In addition to finding that the fishermen’s claims were barred by the economic loss rule, the Second District also found their claims, .barred, because “Mosaic did not owe an independent duty of care to protect the fishermen’s-purely -economic interests — that is, their expectations of profits from fishing for healthy fish.” Curd, 993 So.2d at 1083. We hold that Mosaic did owe a duty of care to the fishermen, a duty that was not shared by the public as a whole.
As a general principle of common law negligence, some courts have not permitted recovery for purely economic losses when the plaintiff has sustained no bodily injury or property damage. See Union Oil Co. v. Oppen, 501 F.2d 558, 563 (9th *1224 Cir.1974) (noting “the widely recognized principle- that no cause of action lies against a defendant whose negligence prevents the plaintiff from obtaining a prospective pecuniary advantage”). The reasoning behind this general rule is that if courts allowed compensation for all losses of economic advantages caused by a defendant’s negligence, a defendant would be subject to claims based upon remote and speculative injuries that he could not foresee. See Oppen, 501 F.2d at 563.[5] Courts have applied this general rule in a variety of ways. Some courts have concluded that the negligent defendant owes no duty to plaintiffs seeking compensation for such losses. See, e.g., Byrd v. English, 117 Ga. 191, 43 S.E. 419 (1903); Chelsea Moving & Trucking Co. v. Ross Towboat Co., 280 Mass. 282, 182 N.E. 477 (1932); Brink v. Wabash R.R., 160 Mo. 87, 60 S.W. 1058 (1901). In some cases, courts have invoked the doctrine of proximate cause to deny recovery. See Byrd, 117 Ga. 191, 43 S.E. 419; Ross Towboat, 280 Mass. 282, 182 N.E. 477. Other courts have relied on the remoteness of the economic loss. See, e.g., Northern States Contracting Co. v. Oakes, 191 Minn. 88, 253 N.W. 371 (1934). Consequently, the defendants were normally relieved of the burden to defend against such claims. See Oppen, 501 F.2d at 563.
Curd contends that commercial fisherman fall into a recognized exception to that general rule. Curd claims that the licensed commercial fishermen have a pro-tectable economic expectation in the marine life that qualifies as a property right. Curd asserts that for years he and the other fishermen have been subjecting the fish, crabs, and other marine life within the polluted area to their “dominion.” Curd asserts that because the State licensed the fishermen and created an economic expectancy, the Second District erred when it concluded that the fishermen did not “own” the marine life at the time of its destruction and thus suffered no property damage. See Curd, 993 So.2d at 1083.
In circumstances similar to this case, courts have allowed commercial fishermen to recover when the alleged injuries occurred on water as a result of activities that occurred on land. In Leo v. General Electric Co., 145 A.D.2d 291, 538 N.Y.S.2d 844 (N.Y.App.Div.1989), commercial fishermen brought an action against the defendant, General Electric Company, for discharging approximately 500,000 pounds of polychlorinated biphenyls (PCBs) from two of its manufacturing plants into the Hudson River. See id. at 292-93, 538 N.Y.S.2d at 845-46. The marine life in the Hudson River, including the striped bass, absorbed the PCBs that collected on the river floor. See id. As a result, the New York State Department of Environmental Conservation imposed a ban on the sale of striped bass fished from the affected waters, and banned the fishing of striped bass anywhere in the State for either commercial or recreational purposes. See id. at 293, 538 N.Y.S.2d 844. The commercial fishermen, who earned their livelihood from fishing the affected waters, claimed that the sale of striped bass accounted for a substantial part of their income and that as commercial fishermen they had a special interest in use of public waters. That special interest, they claimed, was invaded by the defendant’s pollution, and they al *1225 leged that the defendant’s public nuisance had and would continue to have a devastating effect upon their ability to earn a living. Accordingly, the fishermen sought damages and injunctive relief. See id.
The court agreed with the fishermen and held that the commercial fishermen did have standing to complain of the pollution of the waters from which they derived their living. See id. at 295, 538 N.Y.S.2d at 847 (citing Louisiana ex rel. Guste v. The M/V Testbank, 524 F.Supp. 1170 (E.D.La.1981), aff'd, 728 F.2d 748 (5th Cir.1984); Pruitt v. Allied Chemical Corp., 523 F.Supp. 975 (E.D.Va.1981); Burgess v. The M/V Tamano, 370 F.Supp. 247 (D.Me.1973), aff'd, 559 F.2d 1200 (1st Cir.1977); Carson v. Hercules Powder Co., 240 Ark. 887, 402 S.W.2d 640 (1966); Hampton v. North Carolina Pulp Co., 223 N.C. 535, 27 S.E.2d 538 (1943); Columbia River Fishermen’s Protective Union v. City of St. Helens, 160 Or. 654, 87 P.2d 195 (1939)). The court found that the fishermen suffered a peculiar or special harm, a diminution or loss of livelihood, which was not suffered by every person who fished the affected waters. Thus, the court determined that the fishermen’s alleged harm was peculiar to them in their capacity as commercial fishermen, and it went beyond the harm done to members of the community. See id. at 295, 538 N.Y.S.2d at 847.
Moreover, in Carson, a licensed commercial fisherman brought an action against a powder company for injunctive relief and damages. The commercial fisherman had permission of the riparian owners of the land to fish a thirty-mile stretch of Bayou Meto, a non navigable stream. The fisherman commercially sold the fish. See 402 S.W.2d at 641. The fisherman claimed that the powder company, in the operation of its plant, had polluted the stream by discharging into it phenolic materials that killed fish, created a rotten egg odor, and made the fish inedible and unsalable. See id. The Supreme Court of Arkansas held that the powder company was liable to the fisherman. The supreme court concluded that even though the powder company corrected this condition, the powder company was liable for damages for loss of profits and damage to the fisherman’s business. The supreme court reasoned that the fisherman had a substantial investment in a business and that it was his only means of livelihood. Therefore, by polluting the water, the powder company prevented the operation of this business, so it became directly liable for any damage, to his business and loss of profits. See id. at 642.
Additionally, in Columbia River Fishermen’s Protective Union, commercial fishermen brought an action against the operators of two plants, an-insulating board company and a paper company, for discharging pollution into the river. The plaintiffs alleged that the pollution destroyed the fish, aquatic life, and its fishing nets. The plaintiffs contended that this caused irreparable injury. See 87 P.2d at 196-97. The Supreme Court of Oregon concluded that the commercial fishermen had a cause of action. See id. at 199-200, The court reasoned that the commercial fishermen had a special interest, distinct from that of the public, in fishing the rivers. In finding a cause of action, the supreme court found that deleting the fish from the rivers prevented the fishermen from pursuing their vocations and earning their livelihood. The court found a vital distinction between the rights of licensed fishermen who are accustomed to fishing in the river and the rights of other citizens of the state. See id. at 197.[6] But see *1226 Kuehn v. Milwaukee, 83 Wis. 583, 53 N.W. 912, 912-14 (1892) (holding that a fisherman had no cause of action in equity because the fisherman was only one of a large number of fishermen affected by the alleged nuisance, he had no special privilege or right to fish in Lake Michigan, and he had no property damaged by the nuisance).
Some courts have also allowed commercial fishermen to recover against the polluter when both the activities and the alleged injuries occurred on water. In Louisiana ex rel. Guste, two ships collided which resulted in pollution of the waters by chemical cargo. See 524 F.Supp. at 1171. Because of the possibility that aquatic life was contaminated by the chemical, the United States Coast Guard temporarily closed a substantial number of square miles of Louisiana waterways and marshes to commercial fishermen, crabbers, oystermen, and shrimpers. See id. The commercial fishermen and other parties who used certain waters for business or recreation asserted various theories of liability, including maritime tort, and private causes of action pursuant to federal statute, the laws of the State of Louisiana, and the laws of the United States. See id. The defendants sought summary judgment on all claims for alleged economic loss, contending that the damages for which plaintiffs sought recovery were consequential results of the ships colliding in which no actual physical damage occurred. Therefore, defendants argued that the plaintiffs could not recover for mere business expectations or losses sustained solely from the negligent interference with contractual relations. See id.
The federal district court disagreed, holding that the collision of the ships and the resulting discharge of the toxic chemical “constituted a tortious invasion that interfered with the special interest of the commercial fishermen, crabbers, shrimpers and oystermen to use those public waters to earn their livelihood and the specific pecuniary losses which can be shown to have been incurred should be recoverable.” Id. at 1174. The court reasoned that the fisherman were exercising their public right to make a commercial use of those waters. See id. (citing Burgess, 370 F.Supp. 247); see also Pruitt, 523 F.Supp. at 978 (noting that commercial fishermen were entitled to compensation for any loss of profits they could prove were caused by defendant’s negligence because the entitlements presumably arose from a constructive property interest in Chesapeake Bay’s harvestable species and the professional fishermen were entitled to recover despite the lack of any direct physical damage to their own property).
Other federal courts have held similarly. In Oppen, commercial fisherman brought an action for economic damages under a federal statute against oil companies for discharging raw crude oil over vast stretches of the coastal waters of Southern California. See 501 F.2d at 559-60. The court found that foreseeability was the crucial determinant as to whether the defendants owed a duty to the commercial fishermen to refrain from negligent conduct in their drilling operations. See id. at 568-69. Therefore, the issue that had to *1227 be addressed was “whether the defendants could reasonably have foreseen that negligently conducted drilling operations might diminish aquatic life and thus injure the business of commercial fishermen.” Id. at 569. The federal circuit court concluded that the defendants could have reasonably foreseen that the negligently conducted drilling operations might diminish aquatic life and injure the commercial fishermen’s business. See id. The court reasoned that the dangers of pollution were known to all, and that the defendants understood the risks of their business. See id. Accordingly, the federal court held that the commercial fishermen had a cause of action to prove their case, and that the defendants were under a duty to commercial fisherman to conduct their drilling and production in a reasonably prudent manner so as to avoid the negligent diminution of aquatic life. See id. at 569-70. The court further noted that the plaintiffs injury was a pecuniary loss of a particular and special nature, limited to commercial fishermen. See id. at 570.
Likewise, in Burgess, a tanker discharged approximately 100,000 gallons of oil into the waters of Casco Bay in Maine. The plaintiffs, commercial fishermen, sought to recover economic damages incurred as a result of the discharge. See 370 F.Supp. at 248. The defendant contended that the plaintiffs economic interests were not legally cognizable because none of the fishermen had any property interest in the coastal waters, marine life, or shores claimed to have been injured by the spill. See id. at 249. The federal court disagreed. Although the court recognized that the fishermen had no individual property rights with respect to the aquatic life harmed by the oil pollution, the court concluded that the fishermen could state a claim for the tortious invasion of a public right because they had a special interest different from the general public to take fish from the coastal waters. See id. at 250. The court found that the fishermen’s injury resulted from defendants’ alleged interference with their direct exercise of the public right to fish. The court reasoned that it would be inappropriate for a person engaged in commercial fishing, who is dependent thereon for his livelihood, to be denied any right to recover for his pecuniary loss on the basis that his injury is no different from that sustained by the general public. See id.
We conclude, as did many of the courts in the cases discussed above, that the defendant owed a duty of care to the commercial fishermen, and that the commercial fishermen have a cause of action sounding in negligence. Four elements are necessary to sustain a negligence claim:
1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
2. A failure on the [defendant’s] part to conform to the standard required: a breach of the duty....
3. A reasonably close causal connection between the conduct and the resulting injury. This is what is commonly known as “legal cause,” or “proximate cause,” and which includes the notion of cause in fact.
4. Actual loss or damage....
Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (alterations in original) (quoting Prosser and Keaton on the Law of Torts 164-65 (W. Page Keeton ed., 5th ed.1984)).
Under Florida law, the question of whether a duty is owed is linked to the concept of foreseeability. We have held that duties may arise from four general sources: (1) legislative enactments or ad *1228 ministrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of a case. Clay Elec., 873 So.2d at 1185 (citing McCain v. Fla. Power Corp., 593 So.2d 500, 503 n. 2 (Fla.1992)). The fourth category encompasses “that class of cases in which the duty arises because of a foreseeable zone of risk arising from the acts of the defendant.” McCain, 593 So.2d at 503 n. 2. As we have explained:
The statute books and case law ... are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result. This requirement of reasonable, general foresight is the core of the duty element.
Id. at 503.
In the present case, the duty owed by Mosaic arose out of the nature of Mosaic’s business and the special interest of the commercial fisherman in the use of the public waters. First, Mosaic’s activities created an appreciable zone of risk within which Mosaic was obligated to protect those who were exposed to harm. Mosaic’s business involved the storage of pollutants and hazardous contaminants. It was foreseeable that, were these materials released into the public waters, they would cause damage to marine and plant life as well as to human activity. See McCain, 593 So.2d at 503 n. 2. Further, the commercial fishermen had a special interest within that zone of risk, an interest not shared by the general community. See Oppen, 501 F.2d at 568. The fishermen were licensed to conduct commercial activities in the waters of Tampa Bay, and were dependent on those waters to earn their livelihood. Mosaic’s activities placed the fishermen’s peculiar interests directly within the zone of risk created by the presence of its facility. As a result, Mosaic was obligated to exercise prudent foresight and take sufficient precautions to protect that interest. See Kaisner v. Kolb, 543 So.2d 732, 735 (Fla.1989) (“Where a defendant’s conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon [that] defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.”).
Here, the discharge of the pollutants constituted a tortious invasion that interfered with the special interest of the commercial fishermen to use those public waters to earn their livelihood. We find this breach of duty has given rise to a cause of action sounding in negligence. We note, however, that in order to be entitled to compensation for any loss of profits, the commercial fishermen must prove all of the elements of their causes of action, including damages.
CONCLUSION
For the reasons set forth above, we hold that the commercial fishermen have both a statutory and common law cause of action. Accordingly, we answer the certified questions in the affirmative and quash the decision of the Second District.
It is so ordered.
PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
POLSTON, J, concurs in part and dissents in part with an opinion.
CANADY, J., recused.

. While the plaintiffs filed one of their causes of action under section 376.313, which provides for individual causes of action for pollution of surface and ground waters, it should be noted that section 376.205, Florida Statutes (2004), provides for individual causes of action for pollution of coastal waters and lands also.

. Although the statute is phrased in the negative, stating that it does not "prohibit” any person from bringing a cause of action, it does not necessarily follow that the statute does not actively create a cause of action. See Aramark Uniform & Career Apparel, Inc. v. Easton, 894 So.2d 20, 26 (Fla.2004).

. Some other state statutes provide that under similar circumstances a fisherman's claim would be permitted. See Del.Code Ann. tit. 7, §§ 6207-08 (2001); 35 Pa. Cons.Stat. Ann. § 6018.611 (2003); R.I. Gen. Laws 1956, § 46-12.3-4 (2007).

. We also noted that even in these two situations, the economic loss rules would not prevent the bringing of an action and recovery for intentional torts, such as, fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent. American Aviation, 891 So.2d at 543.

. After stating these general principles, however, the court, ultimately held that the defendants in that action, who were drilling for oil and caused vast quantities of crude oil to be released into the coastal waters of Southern California, owed a duty of care to the commercial fishermen to refrain from negligent conduct that would reasonably and foresee-ably cause a diminution of the aquatic life in those waters.

. In addition, some courts have allowed business owners to recover when the alleged injuries occurred on water as a result of activities that occurred on land. See Masonite Corp. v. *1226 Steede, 198 Miss. 530, 23 So.2d 756 (1945) (concluding that a business owner could recover a judgment against a manufacturing plant for loss of profits she claimed she would have made in her business but for the plant's discharge that killed the fish in the Pascagoula River); Hampton v. North Carolina Pulp Co., 223 N.C. 535, 27 S.E.2d 538 (1943) (holding that a fishery owner had stated a cause of action for nuisance because the waste from a pulp mill had destroyed or diverted the run of the fish, which seriously injured or destroyed his business and diminished the value of his riparian property).